WILLIAM J. ROWLAND et al.

*v.*

NEW YORK STABLE MANURE COMPANY.

[Submitted April 29th, 1917.   Decided July 10th, 1917.]

1. Storing of forty thousand tons of manure from about May 1st to the latter part of September, emitting foul odors, corrupting the air, and penetrating the homes of complainants, is a nuisance.

2. The causes of action alleged, viz., defiling the air and pollution of water, are properly joined in one bill of complaint.

3. Complainants need not show prior application to the local board of health to abate the nuisance and its refusal to act, in order to maintain their bill.

4. Eight years' endurance of the nuisance does not constitute laches—every day's continuance is a new nuisance.

5. Where the damage is substantial, a court of equity will in the first instance determine the question of nuisance and grant relief.

6. Defendant's outlay expended on the property was without the implied consent of complainants, and does not estop them.

7. Where a nuisance is clearly established, and is causing material irreparable injury to complainants, they are entitled to an injunction, irrespective of resulting damages to defendant.

On bill, &c.

*Mr. John P. Kirkpatrick* and *Mr. Russell E. Watson,* for the complainants.

*Mr. Edgar W. Hunt, Mr. Spencer Weart* and *Mr. Edward H. Hoos,* for the defendant.

BACKES, V. C.

This is a bill to abate a nuisance to habitations, caused by offensive odors arising from manure piles. The defendant's business is that of gathering horse manure from stables in New York, Brooklyn and Jersey City, and shipping it direct

to farmers and dealers in fertilizers, except during the crop growing season, when the collections are stored at the defendant's plant on the Rocky Hill branch of the Pennsylvania railroad near Monmouth Junction. Storing begins about May 1st, and continues until the latter part of September, when reshipments commence, lasting until the end of the year. On an average, twenty carloads of manure, of twenty-five to thirty tons each, are received daily, the annual accumulations approximating forty thousand tons. The cars are unloaded by cranes and dredges and the manure is stacked in ricks twenty feet high, about one thousand feet long, and from thirty to fifty feet in width. To keep the manure from burning—the animal heat is so intense as to be physically unendurable—requires soaking with water for a period of three weeks. The water is drawn from what is called the "Black Pool," which is replenished by the drainage from the manure ricks. The complainants allege that these manure piles and the Black Pool emit foul, nauseating and sickening odors, corrupting the air and penetrating their homes, greatly to their inconvenience and discomfort.

The principles of law applicable to this kind of nuisance have been so often reiterated that I pause before restating Chancellor Zabriskie's pertinent declarations in *Cleveland* v. *Citizens' Gas Light Co., 20 N. J. Eq. 201:* "Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained; and smoke, noise and bad odors, even when not injurious to health, may render a dwelling so uncomfortable as to drive from it any one not compelled by poverty to remain. Unpleasant odors, from the very constitution of our nature, render us uncomfortable, and, when continued or repeated, make life uncomfortable. To live comfortably is the chief and most reasonable object of men in acquiring property as the means of attaining it; and any interference with our neighbor in the comfortable enjoyment of life, is a wrong which the law will redress. The only question is what amounts to that discomfort from which the law will protect."

The complainants, ten in number (four were admitted during the course of the trial) and their witnesses, reside within a radius of a mile or so of the defendant's plant, in different directions, encircling it, and their evidence (of a score and more) leaves not the shadow of a doubt that they suffered much annoyance and misery from these offensive and disturbing smells. It would be impracticable here, and it would serve no practicable purpose, to recount their testimony. Their definitions and characterizations of the ill-smelling odors vary with the witnesses' power of description; as one of the witnesses tersely put it "it is hard to describe a bad smell." A summary of their experiences, and the effects and results of the smells by which, after all, the question of nuisance is to be determined, is, that whenever the wind blew towards them from the direction of the manure heaps, the atmosphere was so laden with the malodor as to cause nausea, headache and vomiting; to cause them to forego their meals altogether, or to leave them unfinished; to seek shelter in their homes with the doors and windows tightly closed; to, at nighttime, suddenly awaken them from sound slumber, and to deprive them of sleep, or compel them to seek sleep with the windows down and doors shut. Children were driven into their homes from play, and members of families from their porches and lawns. All of these things did not, of course, happen to all of the witnesses, but nearly all of them to some, and some to all or members of their families, in their turn or in groups, as the winds favored during the hot summer months; and especially were they affected during sultry, damp and foggy periods, when the vapors could be seen arising from the storage grounds and wafted towards their abodes. The effluvium was constant, the inflictions intermittent and recurrent, as the air currents shifted. The testimony of the complainants as to this state of affairs is supported by some of the witnesses called by the defendant, and is not overcome by others who testified that the odors smelled like stable manure and that they were not distressed. I am ready to believe that the smell was like that of stable manure, but stable manure plus noisome gases and vapors generated by these enormous heaps of dung, during the cooling process. It requires no proof to satisfy me of the

great difference in volume and pungency of odors emitted by ordinary barnyard manure piles, and those that come from immense deposits, such as the defendant stores, for I need only recall the stifling and overpowering stenches that came from the horse stable manure stored in large quantities on the Newark meadows some years ago, and I believe by this very defendant company, and how we were obliged to close car windows and doors, and stop breathing, while traveling by; and, indeed, we experience the same disagreeable sensations in our present daily travel. when passing long trains freighted with this animal excrement. The evidence makes out a clear case of nuisance to the complainants in the comfortable enjoyment of their homes— denounced by judges and text-writers as among the worst class of nuisances—and of a type similar to many reported in our books, which this court suppressed. *Ross* v. *Butler, 19 N. J. Eq. 294; Cleveland* v. *Citizens' Gas Light Co., supra; Meigs* v. *Lister, 23 N. J. Eq. 199; Pennsylvania Railroad·* v. *Angel, 41 N. J. Eq. 316; Rausch* v. *Glazer, 74 Atl. Rep. 39; Laird* v. *Atlantic Coast Sanitary Co., 73 N.. J. Eq. 49; Kroecker* v. *Camden Coke Co., 82 N. J. Eq. 373.*

The nuisance determined, I will take up in the order submitted by the defendants' counsel on the argument and in the briefs, the various objections to granting complainants' relief.

Before answer filed, a motion was made to strike out the bill as amended, on the ground of multifariousness. The gravamen of the bill, as originally drawn, was nuisance to habitation by defiling the air, and by the amendment an additional injury to one of the complainants was alleged by reason of the pollution, from the "Black Pool," of a natural stream running through his· property. Decision was reserved until final hearing, with the understanding that if it went against the complainants the amendment. was to be withdrawn and ɜ n independent bill filed, with the further stipulation that testimony was to be taken on both branches of the case and used in the second suit, if one became necessary. Under the former practice the joining of these causes of action would have been improper (*Davidson* v. *Isham, 9 N. J. Eq. 186; Morris & Essex Railroad Co.* v. *Prudden, 20 N. J. Eq. |530*), and would not have been

permitted under the rule of this court promulgated by Chancellor Zabriskie at the March term 1869 (*Rowbotham* v. *Jones, 47 N. J. Eq. 337*), but by the supplement to "An act respecting the court of chancery," *P. L. 1915 p. 184*, the joinder is now allowed. Sections 24 and 25 of subdivision 3 of paragraph "Schedule A" provide:

> "24. Separate Causes of Action. Persons interested in separate causes of action may join as complainants or be joined as defendants, respectively, if the causes of action have a common question of law or fact, and arose out of the same transaction or series of transactions.
> "25. 'Transactions.' The transactions referred to in the preceding section include any transaction which grew out of the subject matter in regard to which the controversy has arisen."

This remedial provision, which has for its object the simplification of chancery procedure, by uniting in one suit all manner of complaint growing out of the same subject-matter, ought to receive most liberal judicial construction. The causes of action joined in this bill—the corruption of the atmosphere and the pollution of water—arose out of the same transaction, viz., the defendant's maintenance of its manure storage ground, to which the same fundamental principles of law are applicable, generally; and while proof of one offence does not establish the other, the two causes of complaint are so closely allied in connection with the subject-matter of the controversy as to, for all practical purposes, embody a common question of fact within the letter and spirit of the legislation. Either a common question of law or a common question of fact warrants a joinder; and the use of the disjunctive particle is an indication of the broad sweep of the legislative intent, along with the trend of the times, towards economy of time, labor and costs of litigation.

By plea, the defendant challenges the complainants' right to maintain this suit without first showing that application had been made to the local board of health to take proceedings, and that the board had, without just cause, neglected or refused to do so. The police power of the state or local boards of health to abate nuisances and to apply to this court to enjoin them, is limited by the statute to those "hazardous" or "injurious to public health." *2 Comp. Stat. p. 2652.* The bill in this case

does not charge that the odors are noxious, unwholesome, or hurtful to health, but alleges merely that they are of a character so offensive and disagreeable as to make life uncomfortable, thus stating a case over which the health bodies have no jurisdiction. *Board of Health* v. *Neidt, 19 Atl. Rep. 318; State* v. *Freeholders of Bergen, 46 N. J. Eq. 173; Board of Health* v. *Lederer, 52 N. J. Eq. 675.* But, if the case were one of a distinct and special injury affecting the enjoyment of property, arising out of a public nuisance, the injured party would be entitled to redress, without first invoking or resorting to the means created by law for the suppression of public offences. Equity sometimes will decline, or, with reluctance entertain, jurisdiction to abate a public nuisance at the instance of an individual suffering an injury distinct from that of the public, where the remedy at law is adequate and efficacious (*Morris & Essex Railroad Co.* v. *Prudden, supra*), or where the legislature has established institutions with power of speedy and economical redress, as for example the public utility commission; but this inclination does not extend to subordinating a right of private redress to a co-ordinate remedy in the public.

The defendant further sets up in its answer that it and its predecessor in title carried on business in the same manner at Monmouth Junction continuously for the past eight years, and that "the complainants are in laches and are therefore debarred from maintaining this suit, unless and until they shall have first established in ordinary proceedings at law the fact that this defendant is guilty of maintaining upon its premises an actionable nuisance." I know of no rule, and no authority has been brought to my attention, to sustain the proposition that equity will not grant relief from a constant or recurring nuisance *because of the laches of the complainants* until the question of nuisance is settled by the verdict of a jury. Where the right or title of the complainant is not disputed, or is apparent, and the fact of the injury has been clearly made out by the evidence, and the damage is substantial, a court of equity will in the first instance determine the question of nuisance and grant relief. *Carlisle* v. *Cooper, 18 N. J. Eq. 241; S. C., 21 N. J. Eq. 576;*

*Duncan* v. *Hayes, 22 N. J. Eq. 25; Stanford* v. *Lyon, 37 N. J. Eq. 94.*

In *Higgins* v. *Flemington Water Co., 36 N. J. Eq. 538,* Chief-Justice Beasley said: "After a court of equity has entertained a bill, and, instead of sending the case to a trial at law, has itself tried the questions of fact involved, and settled the legal right in favor of the complainant, it certainly would be a result much to be deprecated, if, at such a stage of the controversy, it was the law that the chancellor were required to say to such a complainant, 'Your right is clear; if you sue at law you must inevitably recover, and after several such recoveries, it then will be the duty of this court, on the ground of avoiding a multiplicity of suits, to enjoin the continuance of this nuisance; still you must go through the form of bringing such suits, before this court of equity can or will interfere.' In those cases in which, to the mind of the chancellor, the right of the complainant is clear, and the damage sustained by him is substantial, so that his right to recover damages at law is indisputable, and the chancellor has considered and established his right, I think it not possible that any authority can be produced which sustains the doctrine contended for by the counsel of the defendant." Where the nuisance is erected and completed, and there is no pressing necessity for intervention, or where on the question of nuisance the evidence is in sharp conflict and doubt exists, a verdict of a jury must be had before equity will aid. *Attorney-General* v. *Heishon, 18 N. J. Eq. 410; Tuttle* v. *Church, 53 Fed. Rep. 422; Elizabeth* v. *Gilchrist, 86 Atl. Rep.* 535. The chancellor may, in his discretion, decline to hear and determine a close question of fact of nuisance and may frame an issue for a jury, to inform "the conscience of the court." *Bassett* v. *Johnson, 3 N. J. Eq. 417; Fisler* v. *Porch, 10 N. J. Eq. 243; Trenton Banking Co.* v. *Woodruff, 2 N. J. Eq. 117; Newark & New York Railroad Co.* v. *Mayor of Newark, 23 N. J. Eq.* 515; *Carlisle* v. *Cooper, supra.*

Upon the argument and in the briefs of counsel they raise the question of laches as a bar in its broader aspect. I do not see how the complainants can be charged with sleeping upon their rights, so as to deprive them of relief. It would be most

inconsiderate to hold that having, for the past eight years, lived in a filthy atmosphere, inhaling and enduring the stench from the defendant's business without complaint, they must patiently submit to further discomfort, and as long as the defendant sees fit to impose upon them. Every day's continuance is a new or fresh nuisance. *Board of Health* v. *Lederer, supra; Society* v. *Low, 17 N. J. Eq. 19. Carlisle* v. *Cooper, supra; Brady* v. *Weeks, 3 Barb. 157; Wood Nuis.* § *18,* foot-note cases. Nor are the complainants equitably estopped by acquiescence. The defendant's outlay in the purchase and preparation of its land, for the purpose of carrying on an offensive trade, was not with the implied consent of the complainants; and if it had been they rightfully could have refrained from taking action in the expectation that the business would be carried on so as not to harm them. The expenditure of about $20,000 by the Pennsylvania Railroad Company in laying additional trackage and building a railroad scale on its own right of way to accommodate itself to the trade of the defendant, which is dwelt upon by counsel as a feature in the element of estoppel, can be of no possible concern.

The defendant puts forth considerable effort to cast the blame for the complainants' annoyance upon a nearby manure storage plant belonging to one McGirr, and also upon loaded manure cars standing on sidings of the Pennsylvania railroad at Monmouth Junction, but the evidence points unmistakably to the defendant as the prime and principal offender. Witnesses have traced the odors by the sense of smell, and the gases and vapors by the eye, directly to the defendant's storage plant, and also located their origin by the direction of the wind. The McGirr plant is small and may have, to some extent, contributed to the nuisance of which the defendant is guilty, and so perhaps the railroad company, but either or both neither justify nor excuse the defendant. *Meigs* v. *Lister, supra.*

The defendant appeals to the court's discretion to withhold relief for the reason that to grant an injunction would do more harm than a denial would to the complainants. The doctrine of "weighing the inconveniences," it is argued, ought to be applied because the injury to the complainants is comparatively small

when contrasted with the annual loss to the defendant's farmer customers of thirty-eight thousand tons of horse-stable manure, "enough to fertilize heavily three thousand eight hundred acres of land, which would produce, on an average good crop, seven hundred and sixty thousand bushels of potatoes," and the consequent loss to the public at large of this great and valuable amount of foodstuff; and the eventual destruction of the defendant's entire business because of its inability, for failure of a market for its commodity, or a place to put it during the summer season, to comply with the city stable owners' demands to be rid of his stable manure daily the year round; not to speak of the defendant's loss of profits. A similar appeal in behalf of the public was swept aside by Chief-Justice Beasley in the *Higgins Case*, wherein he quoted Lord Cranworth in *Broadbent* v. *Imperial Gas Company, 7 De G. M. & G. 436:* "If it should turn out that this company had no right so to manufacture gas as to damage the plaintiff's market-garden, I have come to the conclusion that I cannot enter into any question of how far it might be convenient for the public that the gas manufacture should go on. * * * But unless the company had such a right, I think the present is not a case in which this court can go into the question of convenience or inconvenience, and say, where a party is substantially damaged, that he is only to be compensated by bringing an action *toties quoties.* That would be a disgraceful state of the law, and I quite agree with the vice-chancellor in holding that in such a case this court must issue an injunction, whatever may be the consequences with regard to the lighting of the parishes and districts which this company supplies with gas." The discretion exercised by courts of equity in refusing injunctions on the ground of greater injury to the defendant, is properly restricted to applications *pendente lite. Tichenor* v. *Wilson, 8 N. J. Eq. 197; Higgins* v. *Water Co., supra; Simmons* v. *Paterson, 60 N. J. Eq. 385.* But, on final hearing, if the nuisance is clearly established, and it appears that it is causing substantial, material and irreparable injury to the complainant, for which there is no adequate remedy at law, the law is settled in this state, and by the great weight of

authority in other jurisdictions, that the complainant is entitled to relief by injunction, irrespective of the resulting damage to the defendant. *Higgins* v. *Water Co., supra; Hennessy* v. *Carmony, 50 N. J. Eq. 616; Campbell* v. *Seaman, 63 N. Y. 568; Sullivan* v. *Jones Steel Co., 208 Pa. 540.* The cases on the subject of comparative injury are collected in the foot-note to *Bristol* v. *Palmer, 31 L. R. A. (N. S.) 881,* and supplemental notes in *L. R. A. 1916-C, 1269.* The principle was upheld in *Simmons* v. *Paterson,* but the court of appeals found itself justified in withholding injunctive relief "in view of such acquiescence and the magnitude of the injury which would fall upon the public by prohibiting the use of the sewers," and held that a substitute remedy of adequate compensation would be a just disposition of the controversy. The nuisance complained of was the pollution of the Passaic river through the defendant's sewer system, built at an enormous expense under legislative authority, and which had existed for many years. The equities that stayed the court's hands were acquiescence and impending peril to health and life.

The defendant relies upon what was said by Vice-Chancellor Pitney in *Hennessy* v. *Carmony, supra,* as furnishing a distinction between the right to an injunction where the act complained of is a trespass to real estate and where the injury is created by noisome and disagreeable odors interfering with the comfortable enjoyment of habitation. The opinion does not show that the vice-chancellor differentiated the remedy. *Reilley* v. *Curley, 75 N. J. Eq. 57.* Pure air and the comfortable enjoyment of property are as much rights belonging to it as the right of possession and occupancy. *Fertilizing Co.* v. *Hyde Park, 97 U. S. 659.*

During the course of the trial counsel for the defendant admitted that there was no method of treatment nor any contrivance by which the nuisance could be overcome, and that there was no remedy short of a removal of the cause. An injunction will, therefore, issue restraining the defendant from storing manure on its premises after the first day of April, 1918. The time is thus extended to enable the defendant to carry on its business during the present summer, and to seek

another location, if one can be found. This will not be burdensome to the complainants, in view of their toleration for the past eight years, and is equitable to both parties. The complainants are entitled to costs.