WILBUR B. DRIVER

*v.*

FRED SMITH et al.

[Decided August 24th, 1918.]

1. In an action strictly *inter partes* between individual parties the court may not deny to a party legal or equitable relief to which he is clearly entitled merely because the effect of the granting of such relief will be to embarrass the party against whom the relief is granted in the performance of war work.

2. In such an action relief cannot be denied upon contracts because the effect of the enforcement of the contracts will be to embarrass the government in war activities unless the effect is such as renders the enforcement of the contracts improper as opposed to a well-defined rule of public policy.

3. Unless a contractor for the government can point to a special privilege which has been created by law or executive or governmental regulations having the force of law, he stands before the court in precisely the same situation as any other person.

4. The court may not, in determining what the effect of the enforcement of its decree will be, consider letters written by officers of the army.

5. In an action brought to enforce negative covenants under the provisions of which parties agree to work for none other than complainant, the court will consider all of the equities, will weigh the conveniences and will withhold its injunction if to grant it would do more injustice than justice.

6. In such an action the effect upon the business of an employer for whom the employes worked prior to the making of the contracts, and who would be entitled to a continuance of the services were it not for the making of the contracts, the employes being enticed away by the complainant as a part of a scheme to injure the prior employer's business, may be considered, notwithstanding that the complainant intended also to advantage himself as well as injure the prior employer.

7. Employers of labor at will have a property right in the services of their employes and are entitled to protection against interference with no sufficient justification.

8. At the time the contracts in suit were entered into—June 1st, 1918—there was a well-defined public policy that labor engaged in war industries should remain static, and that disputes with respect to wages and conditions should be settled through government agencies.

9. Contracts obtained as part of a scheme which, if successful, would have the effect of disrupting the organization of a plant engaged in the manufacture of war materials essential to the prosecution of the war, are voidable so long as they remain executory, and this is so, whether the parties intended to advantage themselves and had in mind no thought of injury to the government or not.

10. Where such contracts are entered into between a prospective employer and employes, and the employes repudiate after realizing the effect of the performance of the contracts, they are entitled to a cancellation of the contracts.

11. In such cases the rule that the court will leave the parties to contracts void as against public policy where it finds them, has no application.

12. The court will not enjoin a party from proceeding with remedies apparently open to him, upon the ground that the party is proceeding merely vexatiously, except in a very clear case.

13. Evidence considered and held that the Driver-Harris Company, in protesting to the secretary of state against the issuance of a charter to the Wilbur B. Driver Company, and to the war industries board, to the capital issues committee, to the priority commissioner, and to various other governmental agencies against the business contemplated to be established by Wilbur B. Driver, did not proceed merely vexatiously and prosecution of these protests will not be enjoined, the company having reasonable ground for its actions.

On bill, &c.

Mr. Arthur T. Vanderbilt and Mr. Ralph Lum, for the complainant.

Mr. Arthur F. Egner, Mr. William P. Martin and Mr. Robert H. McCarter, for the defendants.

LANE, V. C.

This is a final hearing. Three bills were filed by complainant against defendants Fred Smith, James Travers and Howard Saylor to enforce negative covenants contained in contracts entered into between complainant and said defendants on June 1st, 1918, under the provisions of which said defendants agreed to enter the service of complainant, for a period of two years, from July 1st, 1918, and agreed that they should not either directly or indirectly be connected or concerned in any other business or person whatsoever during the said two years of service. To the

bills said defendants answered admitting the making of the contracts and alleging that prior to the making thereof they had for a considerable space of time been employes of the Driver-Harris Company, of which until the 28th day of May, 1918, complainant, Wilbur B. Driver, was a director; that prior to the signing of the contracts complainant had, while still a director of that company, by coercion, persuasion and offers of greater returns induced defendants to sign contracts similar to those in suit; that the obtaining of the contracts was a part of a scheme by which complainant sought to entice away from the Driver-Harris Company employes essential to its organization so that its business might be disrupted; that the Driver-Harris Company was engaged in working on contracts for the government of the United States for war material absolutely essential to the making of gas masks, and which material could not be manufactured at any other place; that defendants were engaged in this work, and that, were they to leave it, the organization of the Driver-Harris Company would be demoralized and production impeded. Although not so alleged in terms, the effect of the answer is that the contracts and the scheme of complainant were in direct violation of a rule of public policy of the United States. It is alleged that immediately after the signing of the contracts, and upon realizing that they were part of a scheme to injure the Driver-Harris Company and were contrary to a rule of public policy, defendants repudiated. By counter-claims they ask that the contracts be declared null and void. The Driver-Harris Company was admitted as a party defendant and filed a counter-claim in which it set up the acts of complainant, Driver, and alleged that he had, while its officer and director, conceived the idea of establishing a rival business, after having a quarrel with the management, and forthwith maliciously proceeded to set out to injure the company by enticing away members of its organization with the purpose of demoralizing its force, and alleged as overt acts the making of the contracts with the individual defendants and the attempts of complainant to entice others of its important employes. It prays for an injunction restraining complainant from further undertaking to entice its employes, servants, agents or officers, and from approaching them with a

view of offering them higher wages and from attempting by any other means to injure said defendant in the prosecution of its important government work or from interfering with or demoralizing its organization.

To this counter-claim complainant answered and also filed a counter-claim against defendant Driver-Harris Company, alleging that, prior to the making of the contracts with the employes of the Driver-Harris Company, he had informed the directors and officers that he intended to sever relations with it; that on May 14th, 1918, he had formally resigned as vice-president and general manager and thereafter did not act on behalf of the company; that on May 25th he resigned as director, which resignation was accepted on May 28th; that he intended to go into the same business for himself; that he acquired the stock of the Murray Wire Company, which was then engaged in the wire drawing business; that he determined to organize a corporation to take over the assets of the Murray Wire Company under the name of the Wilbur B. Driver Company; that he had approached employes of the Driver-Harris Company with offers of employment but without malicious intent; that he and the individual defendants had entered into the contracts referred to in the bill of complaint; that the Driver-Harris Company in order to annoy and impede him had protested to the secretary of state against the granting of a charter to the Wilbur B. Driver Company, to the war industries board, the capital issues committee, the priority commissioner and various other governmental agencies against the establishment of the business contemplated to be established by complainant; that in these protests certain false representations were made; that the Driver-Harris Company by threats and false representations induced the individual defendants to break their contracts; that it made false representations to customers and prospective customers of complainant and the Murray Wire Company with the result that the business of complainant had been seriously affected and that the acts of the Driver-Harris Company tend to stifle competition. He denies any intent maliciously to injure the Driver-Harris Company, or that the effects of his efforts would be to demoralize its force or to seriously interfere with the production of war ma-

terials.  He prays for an injunction restraining the company from interfering with and obstructing the complainant and the Wilbur B. Driver Company, and the Murray Wire Company in their attempts to carry on their business or in their attempts to establish the same, or directly or indirectly attempting to embarrass them, or either of them, in their establishment of their business or the conduct of the same.

This cross-bill was filed by Wilbur B. Driver, Murray Wire Company and Wilbur B. Driver Company, the latter two brought in as parties by the counter-claim of defendant Driver-Harris Company.  To this counter-claim defendant Driver-Harris Company answered.

The determination of the respective litigations depending upon the same facts, the causes and issues were consolidated for hearing.

There are four distinct issues to be determined—*first,* whether a court of equity will enforce the negative covenants contained in the contracts; *second,* whether the contracts should be canceled or whether complainant should be permitted to seek such remedy as he may have at law; *third,* whether complainant should be enjoined from enticing employes of the defendant Driver-Harris Company; *fourth,* whether the defendant Driver-Harris Company should be enjoined from interfering with the business of the complainant and the Murray Wire Company and the Wilbur B. Driver Company in the manner set forth in the counter-complaint.

A preliminary objection was made to the granting of any relief to complainant on his original bills by this court, for the reason that should relief as complainant desired be granted, it would result in detriment to the government in the progress of the war. As partial proof of this fact there was presented a letter addressed to the court, under date of July 15th, written by William L. Sibert, a major general of the United States army, and director of the chemical and warfare service, in which he states that he would regard any action of the court of chancery which would result in preventing Smith working for the Driver-Harris Company as highly detrimental to the interests of the government at this time.  There was also presented a letter addressed

to the court, written by T. W. Sill, a captain of the sanitary corps, and commanding officer of the Astoria detachment of the gas defence service, under date of July 16th, 1918, in which he. referring to Smith, states that he has been informed that Smith's services were indispensable in carrying out the completion of the orders the government had with the Driver-Harris Company, and that it is therefore essential to them from a patriotic standpoint, as well as necessity that his services, utilized in the production of this equipment, be not interfered with; that it is also his understanding that the necessary production could not be secured with the necessary promptness without utilizing the present facilities of the Driver-Harris Company's equipment and organization. There was legal evidence before the court, including that of a lieutenant, in charge of the Driver-Harris Company's plant, as inspector, from which the court has reached the conclusion that to compel the individual defendants to cease working for the Driver-Harris Company would, to a very appreciable extent, cripple its force and would result in delay of production which would be detrimental to the interests of the government. The Driver-Harris Company intimates that this being so, the court will, as a matter of course, withhold its decree. This is a final hearing in an action strictly *inter partes*. The government has not sought to intervene. I can readily conceive that, on preliminary applications, where the interests of the parties will not be substantially affected or where the matters are such as rest in pure discretion, the action of the court may be influenced by the effect of its order on governmental activities, and in such cases it may be that the court will take notice of matters affecting the public welfare, although communicated to it merely in writing. Such is the statement of Judge Hough in *Marconi Wireless Telegraph Co.* v. *Simon, 227 Fed. Rep. 906.* What Judge Hough said on this branch of the case is purely *obiter,* for he proceeded to consider the merits and on the merits dismissed the bill. The gist of his decision is summed up in his words (on *p. 911*) : "Simon did agree with the naval authorities to contribute toward what would ordinarily be an infringement, but the United States could not infringe by using what Simon made because it was a licensee. Therefore, Simon could

not be a contributory infringer by assisting in doing a lawful thing. On this view of the facts the conclusion urged by defendant is logical." His determination was affirmed in the circuit court of appeals for the second circuit (*231 Fed. Rep. 1021*), but there was a strong dissent by Circuit Judge Ward. He concludes his opinion: "Courts out of regard for public policy will no doubt refuse to interfere in proper cases with government activities by enjoining independent contractors as a matter of discretion, just as the district judge has done, but the bill should not be dismissed even if the injunction be denied."

In a case in this court Vice-Chancellor Backes is reported in the Law Journal (*41 N. J. L. J. 163*) to have said that this court would not grant a decree which would have the effect of interfering with governmental activities in time of war. The case before the vice-chancellor, as gathered from the report, involved the right of the board of health of this state to enjoin the pollution of a stream as a nuisance, and it was brought to the attention of the court that if the injunction went there would be injury to the government, in that the making of certain chemicals necessary for war purposes would be interfered with. It is significant that the action was not one between individual parties, but one in which on one side was an individual and on the other side a governmental department of this state. No support, I think, can be found either in the opinion of Judge Hough or the reported statement of Vice-Chancellor Backes for the proposition that in an action strictly between individuals the court will or can deny to a party legal or equitable relief to which he is clearly entitled merely because the effect of the granting of such relief will be to embarrass the party against whom the relief is granted in the performance of war work. So long as the courts are open the rights of parties must be determined by the existing law. It would be an intolerable situation if each court before whom the rights of individuals were litigated were permitted to determine whether relief should be granted or withheld upon its opinion as to whether the granting or withholding relief would aid or injure the government in its war activities, and it would be still more intolerable were the courts permitted to base their opinion upon written statements of officers of the army, no matter

how high their rank. The general government does not have to depend upon the favor of courts. Its power is limited only by such constitutional interdictions as remain in force during war. If the effect of a decree of the court rendered under existing law be to embarrass the government, the fault lies either with the constitution or the legislative branch of the government for failure to confer sufficient power upon the executive, or upon the executive for failure to have exercised power conferred. So far as the present case is concerned, there is no lack of power to remedy any harm which may be occasioned to the government by the enforcement of a decree of this court, if it should be granted. Under existing law it has full and complete authority to take over and operate, through its own agents, any essential war industry. The time has not yet arrived when courts will permit the appropriation of the property of one by another upon the plea that the other needs the property for war purposes. I cannot think it would be seriously argued that a court to whom application was made for process of attachment would be justified in withholding a writ upon the plea that the service of the writ might interfere with the property being sent abroad and thus affect the government, nor can I think it can be seriously argued that a writ of *ne exeat* could properly be denied because the individual affected was engaged in important government work which required his absence from the state. In the one case the goods might be bonded, and in the other the individual might be sworn into the service of the United States. Contractors with the government are entitled only to such privileges and preferences as are granted to them by the law as it exists. Unless a contractor with the government can point to a special privilege which has been created by law or by executive or governmental regulations having the force of law, he stands before the court in precisely the same situation as any other person.

The language of Lord Cranworts, in *Broadbent* v. *Imperial Gas Co., 7 De G. M. & G. 436,* quoted by Chief-Justice Beasley in *Higgins* v. *Flemington Water Co., 36 N. J. Eq. 538,* and by Vice-Chancellor Backes in *Rowland* v. *New York Stable Manure Co., 101 Atl. Rep. 521* (at *p. 524*), as follows: "If it should turn out that this company had no right so to manufacture gas

as to damage complainant's market garden, I have come to the conclusion that I cannot enter into any question as to how far it might be convenient for the public that the gas manufacture should go on. * * * But, unless the company had such a right, I think the present not a case in which this court can go into the question of convenience or inconvenience and say, where a party is substantially damaged, that he is only to be compensated by bringing an action *toties quoties*. That would be a disgraceful state of the law, and I quite agree with the vice-chancellor in holding that in such a case this court must issue an injunction whatever may be the consequences in regard to the lighting of the parishes and districts which this company supplies with gas," is as applicable in time of war as in time of peace. Unless the contracts by reason of the effect of their enforcement are contrary to a well-established public policy, the court must grant the legal or equitable relief to which the parties may be entitled.

I, therefore, disregard in the determination of this case the letters which have been addressed to the court by Captain Sill and Major General Sibert and will proceed to determine the merits of the controversy uneffected by what the effect of the decree will be, if granted, except in so far as that effect may be considered in determining what are the actual legal and equitable rules which govern the case.

The facts as I find them are as follows:

Frank L. Driver is the president of the Driver-Harris Company. His brother Wilbur B. Driver had been associated with him in business prior to 1905 or 1906. There then was a quarrel and Wilbur B. Driver left the company. There was litigation between the parties. *Driver* v. *Driver-Harris Co., 70 N. J. Eq. 84.*

Wilbur B. Driver returned to the company in 1914, and in May, 1918, was the vice-president and manager in charge of the production department. Prior to May 25th there was a disagreement between the brothers with the result that on May 14th Wilbur B. Driver resigned as vice-president and manager, and there was elected to succeed him Frank L. Driver, Jr., a son of Frank L. Driver. On May 25th Wilbur B. Driver sent in his

resignation as director, which was accepted by the board on May 28th. At the time he left he was extremely irritated at the situation and had conceived the idea of establishing a rival business. In order to accomplish this object, and to do as much damage as he could to the Driver-Harris Company, he intended to get as many as he could of the employes essential for the conduct of the business of the Driver-Harris Company away from it. That concern was engaged in manufacturing material under contracts with the United States government which was essential to the conduct of the war. The material goes into the making or production of gas masks, and the plant is the only one from which it can be obtained in sufficient quantity.

Wilbur B. Driver was perfectly familiar with the organization of the Driver-Harris Company and knew exactly what effect the removal of certain of its employes would have upon that organization. He deliberately approached, with offers of higher wages and other inducements, those employes whose removal would do the greatest injury to the company. He went so far as to endeavor to get Frank L. Driver, Jr., who had secured deferred classification as a necessary assistant or associate manager of an industrial enterprise upon affidavits signed by Wilbur B. Driver. In the affidavits Driver swore that there were no other employes in the plant in the same position as Frank L. Driver, Jr., and none qualified to perform the same duties; that Frank L. Driver, Jr., could not be replaced by any other person; that it would require two or three years of actual experience to become familiar with the work of the industry and special products; that a discontinuance of, or even a serious interruption in the industrial enterprise in which Frank L. Driver, Jr., was engaged, would result in substantial and material loss to the adequate and effective maintenance of the military establishment and the maintenance of the national interests during the emergency.

As indicating clearly that the purpose of Wilbur B. Driver was not only to benefit himself but to injure the Driver-Harris Company, his actions with respect to the private secretary of Frank L. Driver, Mrs. Mildred Clark, are significant. Mrs. Clark's husband was a bookkeeper. Mrs. Clark for some time had been the private and confidential secretary to Frank L.

Driver. She not only attended to his business in connection with the company, but managed his private affairs and was to him all that the term "confidential secretary" implies. Some time in the early spring of 1918 she had mentioned her husband to Wilbur B. Driver, and had stated that if he could do anything for her husband she would be gratified. Immediately upon Driver's conceiving the idea of establishing a rival concern he approached Mrs. Clark going to her home and offering her husband a position as bookkeeper, bringing to Mrs. Clark's mind the fact that if her husband accepted the position as bookkeeper she could no longer work for the Driver-Harris Company. The circumstances under which this offer was made lead me to conclude that it was not for the advantage of Wilbur B. Driver, but for the purpose of depriving Frank L. Driver, in a spirit of petty revenge, of the services of his confidential secretary.

Of the many employes approached by Driver he succeeded, while still a director of the company, in getting contracts from three—Smith, Travers and Saylor. These contracts provided that the three should work for Wilbur B. Driver for a period of two years, to commence at once. Subsequently, and on June 1st, there were executed other contracts similar in form except that the period of employment was to commence July 1st. I do not believe that the reason for the execution for the new contracts was as stated by Wilbur B. Driver, that it was desired that there should be a change in the date of the commencement of the employment. I think they were executed because of a feeling on the part of Wilbur B. Driver that the first contracts, executed at a time when he was still a director of the Driver-Harris Company, were invalid.

At the time of the execution of the contracts, Wilbur B. Driver had no plant in which the services of the three employes could be utilized. He acquired control of the Murray Wire Company and caused to be incorporated on June 25th, 1918, the "Wilbur B. Driver Company." The contracts for employment provide that they may be assigned by Driver to a corporation to be formed to carry on the wire and foundry business. The Murray Wire Company, while a going concern, operates in a very small way.

The three employes, while essential to the organization of the Driver-Harris Company, are not at the present time essential to any work that Wilbur B. Driver is performing. His statement that he desires the services of Smith in order that Smith might assist in the location of a plant, I do not believe. His purpose in insisting upon the withdrawal of the three employes from the Driver-Harris Company plant at this time, I think, is not that he may be substantially advantaged, but that the Driver-Harris Company may be substantially harmed.

The three employes did not agree to go with Driver until after considerable persuasion. There were several meetings between Driver, the employes and others whom Driver had approached.

On May 24th, after Smith had agreed to go with Driver, he wrote Driver a letter in which he said:

"I have been thinking over very carefully the proposition which you mentioned to me, and it seems to me that I was a little hasty in stating that I would work with you as foreman of the foundry which you intend building. I have tried to look at it from all sides and to consider my own interests and those of the Driver-Harris Company, for whom I am now working.

"As you, of course, know the company has a great deal of government work on hand, and it would not seem right to leave the company at this time, as the government is depending on every one of the men here to get the work out as fast as possible.

"In view of the above it will be impossible for me to accept the position which you offer at the present time."

Notwithstanding the receipt of this letter, Driver again approached Smith and succeeded in finally getting him to sign the contract upon which his suit against Smith is grounded.

Subsequent to the execution of the contracts, and upon it being brought more forceably to the attention of the employes what the effect of their withdrawal from the plant of the Driver-Harris Company would be, and upon the Driver-Harris Company offering them higher wages, all three repudiated the agreements and declined to serve thereunder.

Driver has not the capital to establish the business, or, if he has it, he does not desire to use it, for he is at the present time seeking capital from outside sources. He has not as yet secured permission from the capital issues committee to issue securities.

If he had the capital and immediately commenced operations it would be several months before the services of the three employes would be particularly advantageous to him.

The contracts of employment contain negative covenants providing that the employes "shall not either directly or indirectly be connected with or concerned in any other business or person whatsoever during the said term of two years." And it is to enforce these negative covenants that Wilbur B. Driver's suits are brought.

First. Will a court of equity enforce the negative covenants?

That the court will, under certain circumstances, enforce negative covenants of this nature is settled. *Myers* v. *Steel Machine Co., 67 N. J. Eq. 300* (at *p. 314*); *Taylor Iron and Steel Co.* v. *Nichols, 73 N. J. Eq. 684* (at *p. 691*); *Sternberg* v. *O'Brien, 48 N. J. Eq. 370.*

In most of the cases which have been cited in which negative covenants have been enforced, it will be found that failure to enforce them would cause loss or damage to complainant other than that occasioned by a mere deprivation of the services of the employes, for instance, cases in which employes under contract to serve for a certain length of time have obtained trade secrets to permit a disclosure of which to rivals would cause injury to the employer.

In the case *sub judice* there is no such element present. The sole purpose of the suit is to compel the employes to work for the complainant by preventing them from working for anyone else. The suit, therefore, while not so in form, is actually one for specific performance. *Taylor Iron and Steel Co.* v. *Nichols, supra.*

In *Brown* v. *Brown, 33 N. J. Eq. 650* (at *p. 655*), the court of errors and appeals said: "Where jurisdiction exists (to enforce specific performance) the remedy is not of right; the court holds it in judicial discretion controlled by principles of equity and justice. 'The question is not what the court must do, but what it may do under the circumstances.' *Radcliff* v. *Warrington, 12 Ves. 332.*"

Again, the same court, in *Blake* v. *Flatley, 44 N. J. Eq. 228* (at *p. 231*), said: "But it is also held that courts of equity will

not interfere to decree a specific performance except in cases where it would be strictly equitable to make such a decree. Whether, therefore, the contract shall be enforced specifically must rest in the sound and reasonable discretion of the court, depending on the equity of the particular case and the nature of the objections to it. It must determine what are the objectionable circumstances which will control its jurisdiction in such cases within the established rules of equity, though none of those rules are of absolute obligation or authority in all cases."

In *Page* v. *Martin, 46 N. J. Eq. 585* (at *p. 589*), Mr. Justice Garrison, speaking for the same court, said: "The attitude of courts of equity upon applications of this character (specific performance) may be summarized in two propositions—*first,* that the relief invoked is not a matter *ex debito justicæ,* but rests in the sound discretion of the court, and *second,* that where a contract is certain in all its parts, and for a fair consideration, and where the party seeking its enforcement is not himself in default, it is as much a matter of course for courts of equity to decree the performance of the contract as it is for courts of law to give damages for the breach of it. That relief rests not upon what the court must do, but rather upon what, in view of all the circumstances, it ought to do, is a distinction which is of little or no practical moment. In every case of this character the court is chiefly concerned with the equities of the parties before it."

Subsequent to this decision this language was reiterated by the same court, again speaking through Mr. Justice Garrison in *Murray* v. *Skirm, 73 N. J. Eq.* (at *p. 378*).

It is significant, however, that the same court, in *Brisbane* v. *Sullivan, 86 N. J. Eq. 411* (at *p. 413*), cited the quotation as follows: "Mr. Justice Garrison, speaking for this court in *Page* v. *Martin, 46 N. J. Eq. 585,* said: 'That relief rests not upon what the court must do, but rather what, in view of all the circumstances, it ought to do. * * * In every case of this character, the court is chiefly concerned with the equities of the parties before it.'"

Subsequent to the decision of the court of errors and appeals, in *Page* v. *Martin,* Vice-Chancellor Van Fleet, in *Ten Eyck* v. *Manning, 52 N. J. Eq. 47* (at *p. 49*), said: "The remedy by

specific performance is not a matter of strict right, but of sound judicial discretion, and will be granted or denied as the justice and right of the particular case shall seem to the court, on full consideration of the rights and equities of the parties, to require."

The court of errors and appeals, in. *Pyatt* v. *Lyon, 51 N. J. Eq. 308* (at *p. 314*), said: "The relief invoked (specific performance) is not a matter *ex debito justicæ;* the bill for specific performance is addressed to the extraordinary jurisdiction of a court of equity to be exercised according to its discretion * * *."

I think probably the clearest and most succinct statement of the rule is that contained in *Blake* v. *Flatley, 44 N. J. Eq.* (at *p. 231*), as follows: "But it is also held that courts of equity will not interfere to decree a specific performance except in cases where it would be strictly equitable to make such a decree."

Mr. Justice Garrison, when he used the term "a matter of course," in *Page* v. *Martin, supra,* could not have meant to overturn the rule that a court of equity will never make a decree against conscience or equity.

If, after considering all the circumstances proper to be considered, and it then appears to this court that all the equities require that there should be a decree of specific performance, of course, as a matter of course, a decree goes. I do not think that *Page* v. *Martin* in anywise limits the effect of the prior decisions on the right of the court to look into all the surrounding circumstances.

In passing on this branch of the case I might say that I am in hearty accord with the language of Vice-Chancellor Pitney in *Feigenspan* v. *Nizolek, 71 N. J. Eq. 382* (at *p. 394*), as follows: "The practice of enforcing negative covenants by this court is well established, and is a part of the growth of equity jurisprudence to meet and keep up with the growth and development of business methods. The policy of the law is that business men should keep their contracts and not turn the contractee over to the uncertain remedy of an action at law for damages for nonperformance. It is, in my judgment, one of the most important functions of courts of equity to prevent injuries which result in damages, in all instances when it is practicable to do so and the

23

tendency is toward extending the protecting power of the court to cases not formerly thought to be sufficient to invoke its action."

A like view, I think, was expressed by Mr. Justice Pitney for the supreme court of the United States in *Central Trust Co.* v. *Chicago Auditorium Association, 240 U. S. 581* (at *p. 591*) ; *60 L. Ed. 811*, considered by me in *Allen* v. *Distilling Co. of America, 87 N. J. Eq. 531* (at *p. 543*).

Vice-Chancellor Van Fleet, in *Sternberg* v. *O'Brien, 48 N. J. Eq. 370*, in dealing with a case involving the enforcement of a negative covenant against working for another than complainant, said (at *p. 375*) : "A court of equity, in exercising its prohibitory power, must always proceed with the utmost caution and see to it that its power is not so exercised as to do more harm than good. The power exists to prevent irreparable wrong and should not, therefore, be used, in any case when its use will produce the very result it was designed to prevent. The rule is fundamental that an injunction should never be granted when it will operate oppressively or contrary to the real justice of the case, or where it is not the fit and appropriate method of redress under all the circumstances of the case, or when the benefit it will do the complainant is slight in comparison with the injury it will do the defendant. The great office of the writ is to protect and preserve, not to destroy. * * * When, therefore, a court is asked either to deprive a person of this right (the right to labor) or to abridge it, it is its duty, before it acts, to consider with the utmost care whether if it does what it is asked to do, it will not, on a careful comparison of the consequences, do more injustice than justice."

*Sternberg* v. *O'Brien* has been cited with approval by the court of errors and appeals in *Trenton Potteries Co.* v. *Oliphant, 58 N. J. Eq. 507*, and in *Taylor Iron and Steel Co.* v. *Nichols, 73 N. J. Eq. 684* (at *p. 687*). The language which I have quoted from it was quoted by Vice-Chancellor Leaming, in the case of *Marvel* v. *Jonah, 81 N. J. Eq. 369* (at *p. 377*).

While this case was reversed by the court of errors and appeals in *Marvel* v. *Jonah, 83 N. J. Eq. 295*, the language quoted of Vice-Chancellor Van Fleet was not criticised. The appellate

court found that the equities of the case required the enforcement of the negative covenants then under consideration.

I am familiar with what Vice-Chancellor Pitney said in *Hennessy* v. *Carmony*, 50 N. J. Eq. 616, reiterated by him in *Law* v. *Smith*, 68 N. J. Eq. 81 (at p. 90), and referred to by Vice-Chancellor Backes in *Rowland* v. *New York Stable Manure Co., supra.*

While the law may be that in the class of cases dealt with in these cases the court cannot on final hearing weigh the conveniences, yet, I think, it is settled that in the class of cases with which I am now dealing the court may consider the consequences and whether or not on a careful comparison of the consequences its decree may not do more injustice than justice.

In the class of cases referred to by Vice-Chancellor Pitney, the ground upon which the English courts refuse to weigh consequences is, that until parliament acts private property of one cannot be taken for public use or the private use of another, and the ground upon which the courts in this state refuse is that the constitution forbids the taking of private property for public use without compensation, and in any event the taking of the private property of one for the private uses of another. But at the time the constitution was adopted the rules governing a court of equity in specific performance cases were well settled.

In considering the consequences the interests of the Driver-Harris Company may be taken into account. The three individual defendants were at the time their contracts were made with Wilbur B. Driver employes of the Driver-Harris Company, and that company was entitled as against others to their continued employment and good-will; that the employment was at will does not alter the situation. *Frank & Dugan* v. *Herold, 63 N. J. Eq. 443* (at p. 451); *Noice* v. *Brown, 39 N. J. Law 569; Hinchman Coal and Iron Co.* v. *Mitchell,* U. S. Advance Sheets, No. 3, January 1st, 1918, page 97; *Quinn* v. *Leathem, App. Cas. (1901) 495; Brennan* v. *United Hatters, 73 N. J. Law 729; Jonas Glass Co.* v. *Glass Bottle Blowers' Association, 77 N. J. Eq. 219.*

The effect of granting the relief asked for by complainant will be to deprive the Driver-Harris Company of the services of its employes. While it has been held that the effect of injunctive

relief upon others than the parties cannot generally be considered (*Rowland* v. *New York Stable Manure Co., 88 N. J. Eq. 168; 101 Atl. Rep. 521*, at *p. 524*), yet it seems to me that the rule does not apply in cases of the nature with which I am dealing, where the effect of the injunction will be to destroy a property right.

As stated above, the larger part of the output of the Driver-Harris Company is war material which can be produced at no other plant. The three employes are essential to the organization. To deprive the Driver-Harris Company of the services of the employes at this time would result in great loss and damage to it. It might result in the taking over of the plant by the government. If the testimony before me is to be believed, in no other way could the government adequately protect itself. The scheme which resulted in the making of the contracts had its genesis at a time when Wilbur B. Driver was a director of the Driver-Harris Company and under a duty to it. The employes signed the contracts only after persistent persuasion. The public interests require that they should continue employment with the Driver-Harris Company.

Vice-Chancellor Van Fleet, in *Sternberg* v. *O'Brien, 48 N. J. Eq. 370* (at *p. 372*), quoted with approval Chief-Justice Best, in *Homer* v. *Ashford, 3 Bing. 322, 326*, as follows: "The law will not permit anyone to restrain a person from doing what the public welfare and his own interests require that he should do."

Assuming, now, that the complainant has shown that the services of the employes are of so special, unique or extraordinary character as that they will be of great advantage to him, this court is without power to compel the employes to render to complainant those special, unique or extraordinary services. By restraining the individual defendants from laboring for the Driver-Harris Company, it is hoped by complainant that they will be compelled to work for him, but there is no certainty of this.

I am not, however, convinced that the services of the employes are of such a special, unique or extraordinary character, considering the situation of complainant, as that an injunction should issue. It is true that the services are essential to the conduct of the business of the Driver-Harris Company, but

it does not necessarily follow that they are essential to the conduct of the business of complainant. Complainant has not yet established such a business as that the services of the individual defendants are required. I do not believe that the services are required for the establishment of the business contemplated to be established. It may be many months before complainant is in a position where the special, unique or extraordinary services will be of benefit to him. If this court should at this time grant an injunction, it would be in effect, I think, enforcing by injunction a contract for ordinary personal services the right to grant which was at least questioned by the court of errors and appeals in *Taylor Iron and Steel Co.* v. *Nichols, 73 N. J. Eq. 684* (at *p. 691*).

Considering all of the circumstances, I am of the opinion that the decree asked for by complainant would do more injustice than justice, and this relief will be denied.

Second. Will the contracts be canceled or will the complainant be permitted to seek such remedy as he may at law?

The individual defendants and the Driver-Harris Company insist that the contracts were obtained under such circumstances as that they are void or voidable both at law and in equity and should be canceled by the court.

It must be taken as settled that the employer has a property right in the services of his employes and is entitled to protection against interference with no sufficient justification. *Lumley* v. *Gye, 2 E. & B. 216; Quinn* v. *Leathem, supra; Notice* v. *Brown, supra; Frank & Dugan* v. *Herold, 63 N. J. Eq. 443; Jonas Glass Co.* v. *Glass Bottle Blowers' Association, supra; Hinchman Coal and Iron Co.* v. *Mitchell, supra.* And it is likewise true that an employe at will may at any time leave his employer and that a stranger may, by an offer of higher wages, induce him to leave his employment and become employed with the stranger. A stranger may not, however, interfere with the employment for no justifiable reason.

In this class of cases motive plays a most important part. It is insisted by Wilbur B. Driver that his purpose in inducing the employes to leave the Driver-Harris Company was to advantage himself, in that he intended to establish a business and that the

employes were essential to him. While this may have been one of his purposes, I have already held that he also deliberately purposed to injure the Driver-Harris Company.

Whether, considering all the circumstances of the case, the contracts are so tinged with the unlawful purpose as that they are void or voidable I find it unnecessary to decide, because I have reached the conclusion that the contracts are voidable, at least, upon another ground.

At the time the contracts were entered into the nation was at war and all of its energies were directed toward the successful prosecution of the war. It was necessary, of course, that war materials should be produced and that such production should not be interfered with. In order that this production might be accomplished, it was essential that the plants engaged in the production of war material should have an adequate supply of labor. The policy of the government necessarily was that labor engaged in war industries should remain static; that disputes with respect to wages and conditions should be settled through government agencies. This public policy had been announced by various government boards established under the authority of acts of congress. The situation became such that prior to the hearing of this case a government regulation had been issued under which, after the 1st of August, the government took control of the supply of ordinary labor. The fact that it did not act, however, until August 1st, does not indicate that there was not in existence at the time these contracts were made a distinct public policy which must be recognized and considered by the court.

Public policy has been defined as that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be designated as it sometimes has been the policy of the law, or public policy in relation to the administration of the law. *13 Corp. Jur. tit. "Contracts"* § *360,* and cases cited.

While it may be too much to say that there was any public policy which prevented labor from moving from plant to plant of its own volition, induced by offer of higher pay or what not, yet I think it safe to say that there was a public policy which

was offended when a person for his own advantage deliberately proceeded to demoralize an organization, the continuance of which was essential to the production of necessary war material.

I agree with Jessell, master of the rolls, in *Printing Registering Co.* v. *Sampson, 19 Eq. 462, 465; 21 E. R. C. 696,* who said: "It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than any other public policy requires it is that men of full age and of competent understanding shall have the utmost liberty of contracting and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by the courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract."

This is based upon the rule that each individual upon arriving at years of discretion should be permitted to live his own life unhampered by any restrictions except such as are necessary for the public welfare. Applying the test which I think must always be applied to a sumptuary rule—*i. e.,* its necessity for the public welfare, not its tendency toward the public good, I find that the rule of public policy I conclude exists, is grounded upon a public necessity just as urgent certainly as that which renders contracts involving an immoral consideration void.

It is, of course, recognized that in order that the freedom to contract may be preserved, in national emergencies it must be abridged. Ordinarily, this is accomplished by direct action of the government through the legislature or executive. I think, however, that contracts, even if not contrary to any express statutory enactment or governmental regulation, may be so opposed to a definite public policy which may be gathered from the laws and regulations in effect as that they may be at least voidable.

At the time the contracts were entered into, and it was contemplated by Wilbur B. Driver that a new business should be established, the government had officially discouraged the establishment of new industries in New Jersey and certain adjoining

states, because of the fuel situation. It had, as above stated, taken control of the issuance of securities for capital for new business, because of the money situation. The establishment of the new business contemplated by Wilbur B. Driver was one within the government regulations.

It is said (*13 Corp. Jur. tit. "Contracts"* § *362*) that there are many things which the law does not expressly prohibit or penalize, which are so mischievous in their tendency that on grounds of public policy they are not permitted to be the subject of an enforceable agreement; that public policy varies with the time and place, and that the mere fact that a precedent cannot be found will not prevent a court from declaring a contract void as against public policy.

Upon its being brought clearly to the attention of the individual defendants that the effect of their performance of their contracts would operate to the disadvantage of the government they forthwith repudiated them and the contracts remained wholly executory. I think that under the circumstances they were within their legal rights and that no action can be brought upon the contracts either at law or equity.

I must not be considered as intimating that it is a complete defence at law or equity in an action brought upon a contract that the effect of·the performance of the contract would be to injuriously affect the government in a war activity. Nor do I intimate an opinion as to whether there may be a recovery upon an executed contract for the sale of merchandise such as sugar, for instance, in violation of government regulations. Nor do I intimate that in the instant case if the employes had worked for Driver there could be no compensation recovered by them for their services.

Principles of law which I am not now considering would in such instances have their application.

What I hold, and all that I hold, is, that contracts obtained as a part of a scheme which if successful would have the effect of disrupting the organization of a plant engaged in the manufacture of war material, essential to the prosecution of the war, are voidable so long as they remain executory. And this is so,

whether the parties intended to advantage themselves and had in mind no thought of injury to the government or not.

The rule that where a contract is void as against public policy the parties will be left by the court in the situation in which the court finds them when they are in *pari delicto,* has no application in the case at bar.

In the first place, the parties are not in *pari delicto.* The contracts on their face are valid. The purpose of injuring the organization of the Driver-Harris Company was in the mind of Wilbur B. Driver alone. It was not in the minds of the employes. If the rule referred to applied to this class of cases at all, the instant case would be within the exceptions referred to in *13 Corp. Jur.* §§ *474, 475.*

While, ordinarily, the question as to whether a contract is contrary to public policy is to be determined by the court, yet there have been cases in which, where the question depended upon the circumstances under which the contract was entered into, it has been left to the jury as a question of fact. *6 Rul. Cas. L. tit. "Contracts"* § *118.*

At the time the employes entered into the contracts they had no knowledge that the contracts were part of a plan contrary to public policy. Either the complainant had such knowledge or he had not. If he had knowledge he was guilty of fraud, and there was fraud on one part or mistake on the other. If he had no knowledge there was mutual mistake. In either event, the jurisdiction of this court, about which there has been raised no question, is complete.

The employes in repudiating the contracts did only that which a sound public policy required them to do at the time. The entire issue has been submitted to the court. I am determining this case, not only upon the ground that the contracts are unenforceable in equity, but upon the ground that the contracts are unenforceable either in law or in equity. Equity having assumed jurisdiction will determine the entire controversy in order to prevent a multiplicity of suits.

I think the individual defendants are entitled to a cancellation of their contracts.

Third. Should complainant be enjoined from enticing away employes of defendant Driver-Harris Company?

In view of the fact that the government has taken over the supply of labor in such industries as the Driver-Harris Company, and inasmuch as it does not appear that Wilbur B. Driver intends to, or that, if he did so intend, he could pursue the tactics complained of, I think there is no necessity for the relief asked for under this head and will deny the application for an injunction without prejudice, expressing no opinion upon the merits.

Fourth. Should Driver-Harris Company be enjoined from interfering with the business of the complainant and the Murray Wire Company and the Wilbur B. Driver Company in the manner set forth in the cross-bill of said defendants?

The charge is that in order to annoy and impede Driver, the Driver-Harris Company protested to the secretary of state against the granting of a charter to the Wilbur B. Driver Company, to the war industries board, to the capital issues committee. to the priority commissioner and to various other governmental agencies against the establishment of the business contemplated to be established by Driver; that in these protests certain false representations were made; that the Driver-Harris Company also by threats and false representations induced the individual defendants to break their contracts; and that it made false misrepresentations to customers or prospective customers of the complainant, or the Murray Wire Company with the result that the business of the complainant has been affected, and it is said that the actions of the Driver-Harris Company tend to stifle competition.

So far as the protest to the secretary of state is concerned, it was justified. The similarity of the name "Wilbur B. Driver Company" to the name "Driver-Harris Company," under the circumstances, is sufficient to warrant a protest. Whether the use of the name will be enjoined or not is another question.

The protests which were made to the government boards and officials were made to boards and officials created by law for the very purpose of passing upon the subject-matters referred to in the protests.

There is no direct proof of express malice on the part of the Driver-Harris Company. There is no proof that any statements made by the Driver-Harris Company were so false, and knowingly false, as that malice can be implied. Most of the statements are backed up by the testimony of the government officials in charge of the particular work. The only statement that is contained in any of the letters that is at all out of the way is that Driver's actuating motive was revenge. It may be that his actuating motive was not revenge, but I cannot say that one of his motives was not. I think the Driver-Harris Company had reasonable grounds to suppose that his motive was revenge. The officers of the Driver-Harris Company may have made the statement or statements that Driver had failed and that he had not performed his obligations to persons whom he was morally obligated to protect when he returned to the Driver-Harris Company. These statements, if made, were not sent broadcast. They were made, if at all, by employer to employe. I cannot say that they were sufficient to warrant any injunctive relief. It would have to be a strong case, indeed, before this court would enjoin a defendant from proceeding with remedies apparently open to him, and that is what I am asked to do on this branch of the case. I do not mean to say that the exercise of legal remedies may not be so vexatious as to warrant this court intervening, but no such situation has developed here. The relief asked for will be denied.

I will advise a decree in accordance with this opinion. Settle the decree on three days' notice.