## Derias Buckles et al., Executors of the Will of Carter R. Scroggin, Deceased, Appellants, v. City of Decatur, Appellee.

### Gen. No. 7,586.

1. WATERS—*pollution is actionable wrong.* A riparian owner has a right to the use of a natural watercourse or stream and any person who causes pollution thereof with filth or deleterious or poisonous substances is liable in damages for injuries resulting therefrom.

2. WATERS—*liability of city as dominant owner for polluting.* A city or municipality occupying the dominant heritage is in the same legal position as to liability to the servient estate concerning the pollution of a stream or watercourse as a private individual would be.

3. WATERS—*size of city polluting stream is immaterial.* The fact that a municipality is large will make no difference concerning its liability for the pollution of a stream.

4. WATERS—*sufficiency of evidence of pollution by city sewage.* In an action for damages resulting from the pollution of a stream by defendant city and consequent injury to plaintiff's stock where practically the only evidence on behalf of defendant was expert opinion evidence upon the nature and kind of germs generated from the waste matter from factories and the fecal matter from the sewage from a city such as defendant, none of which controverted the testimony of plaintiff's witnesses who testified with reference to the general effect of the river water on the cattle raising industry and to the poor condition of the cattle apparently resulting from drinking the water, a verdict for defendant was manifestly against the weight of the evidence.

Appeal by plaintiffs from the Circuit Court of Macon county; the Hon. FRANKLIN H. BOGGS, Judge, presiding. Heard in this court at the October term, 1923. Reversed and remanded. Opinion filed April 30, 1924.

MILLS BROS. and WHITLEY & FITZGERALD, for appellants.

LEE, BORLAND, Corporation Counsel, and R. J. MONROE, for appellee.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

In this case, Carter R. Scroggin, the owner of a large stock farm situated about seven miles southwest of the City of Decatur, a municipality of about 45,000 population, on the Sangamon River, a natural watercourse flowing along that part of the Scroggin land which was used raising live stock of all kinds, including cattle, mules, horses and sheep, commenced this suit to recover damages for the injuries to his cattle, horses, mules and sheep, by the pollution of the waters of the Sangamon River, by the City of Decatur, which emptied its sewage into the river through its sewerage system. After the suit had been instituted, Scroggin, the plaintiff, died and the appellants Derias Buckles, Abraham C. Birks and William E. Birks, as executors of the will of Carter R. Scroggin, deceased, were substituted as plaintiffs.

It is well settled that a riparian owner has a right to the use of a natural course or stream, and that any person who causes pollution of a watercourse with filth, or deleterious or poisonous substances, is liable in damages for injuries resulting therefrom. *Barrett v. Mount Greenwood Cemetery Ass'n,* 159 Ill. 385; *City of Kewanee v. Otley,* 204 Ill. 402. And a city or municipality occupying the dominant heritage is in the same legal position as to liability to the servient estate concerning the pollution of a stream or watercourse as a private individual would be. *Robb v. Village of La Grange,* 158 Ill. 21; *Dierks v. Commissioners of Highways,* 142 Ill. 197; *Village of Dwight v. Hayes,* 150 Ill. 273; *Crane v. Village of Roselle,* 236 Ill. 97; *City of Kewanee v. Otley, supra.* Nor does the fact that the city or municipality is large make any difference concerning its liability. *Voss v. Chicago Sandoval Coal Co.,* 165 Ill. App. 565; *Rowland v. New York Stable Manure Co.,* 88 N. J. Eq. 168, 101 Atl. 521.

Upon the last trial of this case in the Circuit Court of Macon county, the jury returned a verdict of not

guilty. A motion for a new trial was denied by the court, and judgment rendered on the verdict, and against the appellants for costs. From this judgment an appeal is prosecuted.

The first count of the declaration, which constitutes the cause of action, and upon which the case was submitted to the jury, charges that Carter R. Scroggin, the original plaintiff, was lawfully possessed of certain real estate described therein, constituting lands situated along the Sangamon River and adapted to the raising of cattle; that the waters of the river run and flow from the City of Decatur, upon and along and through this land; that Scroggin had been extensively engaged in the business of stock raising upon this land; and that the land is suitable for that purpose; and that it has been improved and used as a stock farm; and that the plaintiff relied upon the waters of the Sangamon River for use by his stock; that the City of Decatur wrongfully and unlawfully constructed and maintains public drains and sewers which discharge into the Sangamon River noxious, filthy and polluted waters, and sewerage from the inhabitants of said city, and the refuse matter from factories situated therein, thereby defiling the river; that this rendered the land of the plaintiff, Scroggin, unsuitable for the purposes for which it was used, and for which it was adapted; that by reason of the discharge of the sewerage mentioned, the waters of the river are rendered injurious to the animals pasturing upon his lands; and that divers cattle and stock of the plaintiff, Scroggin, feeding and pasturing upon his land, which drank of the waters of the river, sickened and died; that the plaintiff was forced and obliged to lay out and expend large sums of money in endeavoring to cure his cattle and stock; and that he was and is deprived of the beneficial use of the pasturage for stock-raising purposes, and the benefit, the use, and advantage of the water of the river, in its

natural state of purity; and that he has been damaged in the diminution or depreciation of the rental value of the lands in question.

It appears from the testimony of the original plaintiff, Scroggin, that about 700 acres of his farm on the Sangamon River had been directly in use for stockraising purposes for five years preceding the commencement of the suit; that he raised and handled cattle, horses, mules and sheep; that he took care of and handled a herd of about 350 head in 1916, and 475 head in 1919; that from 225 to 250 head of sheep ordinarily were raised on the farm, also horses and mules; that all these animals had access to, and were dependent for drinking water upon, the Sangamon River, which flowed along that part of the farm which was used for pasturage; that he had observed the condition of the river and the effect the drinking of the water therefrom had upon the cattle, since 1916; that he observed from time to time that his cattle were not in a thrifty condition; that some of the cattle died in 1916, 1917 and 1918; that the effect of drinking the river water upon the cattle grew worse after 1917; that in 1918 he particularly noticed they were not doing well; that they had a general unthrifty appearance, and kept getting worse. During the years 1918, 1919 and 1920, to use his own language he "noticed in 1918 that they were not doing well; that they had a general unthrifty appearance, and kept getting worse; the coats of some were rough, they looked gaunt and weren't doing any good. Others didn't seem so badly affected; in 1919 the cattle afflicted were considerably worse, and some died during that year; most of them died in 1920. The number that died footed up to about 57; before that they had died once in a while;" that he had horses and mules and sheep which were also affected by the polluted water of the river; that he had 10 yearling mules running in the pasture, drinking the river water, seven of

which died and two horses or mares died also; that the mules were in a thriving condition when he put them in the pasture, before they had drunk the water of the river; that he also lost some of the sheep that were in the same pasture, and had drunk of the river water; that in May, 1919, the cattle commenced to die right along; and that he finally sent for a veterinary (Dr. Mills), who made an examination to ascertain what was the matter. As to the polluted condition of the river, W. B. McDaniels, who was a neighbor of Scroggin, and a resident in that locality for about 43 years, testified concerning the condition of the water of the river, and in answer to a question to describe its condition said: "Milky; at times looks blue; next time probably will be black. Smells very bad. During the five years mentioned, I have noticed a condition in the bottom after an overflow, after a freshet. A sediment settles on the grass and the stock wont eat until after it comes a rain and washes it off, and places where the water stands, the grass dies, that is, if it stands any length of time." In answer to a question propounded concerning fish in the river, the witness said: "Yes sir. I have seen them laying along the bank after an overflow. The fish come up the river in the spring of the year and when the water goes down and gets low the fish die." In answer to the question as to the condition of the river water, at the time he noticed the dead fish, the witness answered: "It was getting pretty bad. I mean it was discolored and the stuff flowing in it had an odor. The odor of the river was offensive. It made me sick at the stomach; gagged me; threw up." A number of witnesses testified concerning the noxious condition of the water of the river, after being impregnated with the sewage that flowed into it from the sewerage system of the City of Decatur, and concerning the condition of the water of the river in the locality of the Scroggin farm. From the testimony

of these witnesses, it is apparent that the condition
of the river varies from a state of ordinary pollution
in the spring of the year, when water in the river is
plentiful, to a state of putrefaction in the late sum-
mer and fall, when the water in the river is low; and
in the latter state, a stench arises and is so strong
as to be almost intolerable, and can be noticed at
times for a distance of five miles from the river. One
witness describes the condition at that time of the
year as being very much like an open sewer. As to
the effect of water in this state of pollution on rais-
ing cattle, horses and mules, and other animals,
Scroggin's testimony is corroborated by the testimony
of Dr. J. C. Mills, veterinary surgeon for 25 years,
who testified concerning the water in the river as fol-
lows: "In the summer when the water is low, there
is quite an odor from the river. It was discolored
usually when I saw it. It was of dark color, or a
grayish drab. In my judgment, as a veterinary, the
water in that condition was not fit for live stock to
drink." And concerning the condition of the Scrog-
gin cattle, he testifies: "The older cattle, some of
them, were only in a fair condition of flesh; some of
them very poor flesh; some of them were weaving
when they walked; their hair coat was rough and
usually a general unthrifty condition." As to the
cause of the condition of the Scroggin cattle, he tes-
tified: "I formed the opinion that the trouble must
have been caused—was caused by some impure or
infectious material that entered into their digestive
tracts causing general emaciation, anemia and finally
death of a part of the animals." The following ques-
tion was also asked: "What effect, Doctor, if any,
would the water out there, the condition of the water
you saw these cattle drink, what effect would it have
on their condition, if you know?" To which he an-
swered: "It would produce unhealthiness on account
of the impurities." Scroggin's testimony with ref-

erence to the effect of the drinking of the water upon
his cattle, and horses, and mules, and sheep, was fur-
ther corroborated by witnesses, who had also noticed
the effect of the drinking of the water of the river,
by other cattle.   One of these, Charles Neibur, a
farmer living on a place adjoining the Scroggin farm,
stated that the Sangamon River running along the
Scroggin land, continues on to the farm on which he
lived, and testified as follows: "Have been familiar
during the last five years with the Sangamon River
during its low season; gets different colors; some-
times black, and a milky color, and has got an awful
odor.   Have 30 acres of pasture land through which
the Sangamon River runs; handled live stock during
the years 1915 to 1920; noticed during these years
having seen them drink out of the Sangamon River
in the condition I have described it.   At that time I
didn't have access to any other water."   He was
asked to describe the condition of the cattle which
had been drinking this water for a while, and an-
swered: "Their hair looked bad, and they looked
thin, and didn't do any good."   Q.   "Well go on and
describe further, if anything took place with the cattle
that drank of this water?"   A.   "I lost six head; six
head died."   Q.   "I will ask you if these six cattle
died, when it was that they died?"   A.   "They didn't
all die at any one time; some of them would die right
soon, and some of them would linger along a while.
These cattle that died, are the cattle I mentioned
drinking the water of the river."   Q.   "How long
after drinking this water, how long after did the first
one die, get in that condition, or get in the condition
so that they died?"   A.   "Some of them, probably
two months, something like that; some of them six
months."   Concerning the same matter, Noah M.
Jacobs, an owner of land along the Sangamon River,
in the same neighborhood, and who was familiar with
the condition of the river, and had observed the effect

on cattle drinking the water of the river, testified: Q. "I will ask you to go ahead and describe the cattle after they drank this water?" A. "Yes sir, some would have good flesh, and apparently not hurt them; others would. I had cattle to drop dead walking right along the fence, just fall like they were shot. I had calves come without any hair on them; undeveloped. Those cows while carrying the calves I have mentioned, drank out of this river." Q. "How many cattle did you lose that drank out of this river, I mean died in the years 1915 to 1920?" A. "I couldn't answer that. I remember one thing, I lost 23 calves. I had cows, and was going to raise calves, and I lost 23 of them, but the number that died I could not tell you." Q. "Did you notice, Mr. Jacobs, what these cattle that dropped dead, and were sick, what their condition was with reference to having diarrhea before they died?" A. "It affected different animals differently." The witness also testified that he had knowledge of Mr. Scroggin having sick cattle from 1915 to 1920. In addition to the testimony concerning the condition of the water as affected by the sewage of the City of Decatur, and its effect on the health and physical condition of cattle, horses, mules and domestic animals, the record discloses the evidence of witnesses who had knowledge of the deleterious condition of the river water, and who had knowledge of the rental value of land in that locality, and who testified to a depreciation in the rental value of the Scroggin land on account of the condition of the river. The testimony of these witnesses is not contradicted.

We are of opinion that the evidence, considered together, constituted a prima facie case for the recovery of damages by the appellant, and that the prima facie case was not overcome by the evidence offered in defense, on the part of the appellee. The proof on the part of the defense in reference to the question at issue was largely made up of the opinions of expert

bacteriologists with reference to the kind and nature of the bacteria or germs generated from the waste and offal of factories and industries, such as subsisted in Decatur, and from the fecal matter, which is usually a part of the sewage of cities; also as to the effect which some of these germs, when mixed with certain quantities of water, might have upon animal life; and some testimony was introduced with reference to the presence of the bacillus which indicated Johnne's Disease in a portion of the cattle constituting the Scroggin herd. There was also some opinion evidence, by the experts mentioned, as to whether or not the Scroggin cattle could have become infected with the germ of the Johnne's Disease by drinking the sewage charged waters of the river. None of this evidence however contradicted or controverted the testimony of the witnesses who testified with reference to the general effect of the Sangamon River water on the cattle raising industry; nor the poor condition of the cattle, which apparently resulted from drinking the water; nor its injurious effect on the development of the cattle for the market, and for human food purposes, which apparently resulted in the loss in the rental value of the land in question, as shown by the evidence. We are of opinion that the verdict was manifestly against the weight of the evidence, and for that reason, the judgment is reversed and the cause remanded.

*Reversed and remanded.*