675 A.2d 1077

RUSSO FARMS, INC., A NEW JERSEY CORPORATION; RFC CON-
TAINER CO., INC., A NEW JERSEY CORPORATION; THOMAS
RUSSO; EVA RUSSO, HIS WIFE; PASQUALE RUSSO; MARIO
RUSSO; ESTATE OF PASQUALE RUSSO, PLAINTIFFS-RE-
SPONDENTS, v. VINELAND BOARD OF EDUCATION; CITY
OF VINELAND; GLENN A. KAHLEY; ART ANDERSON, INC.,
A NEW JERSEY CORPORATION, DEFENDANTS-APPEL-
LANTS, AND LIPPINCOTT ENGINEERING ASSOCIATION;
DANIEL W. JACOBS, P.E.; JOHN DOE; JANE DOE AND MARY
DOE (FICTITIOUS), DEFENDANTS.

Argued January 17, 1996—Decided May 7, 1996.

86

*Eric M. Wood* argued the cause for appellant City of Vineland (*Horn, Goldberg. Gorny, Daniels, Plackter & Weiss,* attorneys).

*Robert A. De Santo* argued the cause for appellant Vineland Board of Education (*Gruccio, Pepper, Giovinazzi, De Santo Farnoly,* attorneys).

*Sarannah L. McMurty* argued the cause for appellant Art Anderson, Inc. (*LaBrum and Doak,* attorneys; *Ms. McMurty* and *Michael G. Brennan,* on the briefs).

*Christine M. Cote* argued the cause for appellant Glenn A. Kahley (*Cooper Perskie April Niedelman Wagenheim & Levenson,* attorneys; *Ms. Cote* and *Michael R. Litke,* on the briefs).

*Walter T. Wolf* argued the cause for respondents (*Wolf Professional Association,* attorneys; *Matthew S. Wolf,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Plaintiffs assert that the Vineland Board of Education (the Board), the City of Vineland (the City), the architect, Glenn A. Kahley (Kahley), and the general contractor, Art Anderson, Inc. (Art Anderson), are liable to them for damage to their crops and farmland from flooding that was caused by the improper siting and construction of a public school across the street from their property and by an inadequate drainage system on a bordering street. The school was constructed in 1979, but plaintiffs did not file suit until 1990.

At issue in this appeal is whether the Tort Claims Act, *N.J.S.A.* 59:1–1 to –12–3, and the six-year statute of limitations governing actions for tortious injury to real property, *N.J.S.A.* 2A:14–1, bar plaintiffs' claims against the Board and the City, and whether that six-year statute of limitations and the ten-year statute of repose set forth in *N.J.S.A.* 2A:14–1.1 bar plaintiffs' action against the architect and the general contractor. Specifically, we must determine whether each incursion of floodwater constitutes a continuing tort, and whether the statute of repose begins to run from the date of substantial or full completion of construction.

I

Plaintiffs, individually and through various corporations (collectively, Russo), own or lease several connected parcels of land in

Vineland, New Jersey that have been used as a single unit for farming. Plaintiffs have owned three of the lots since 1970 and purchased seven other lots after 1985.

Those parcels of land are bordered on the south by Grant Avenue, and on one side by South East Avenue, a road that is perpendicular to and intersects with Grant Avenue. While Grant Avenue apparently has had a drainage system, the street historically has been the site of flooding due to inadequate drainage.

In 1977, the Board decided to construct the Dr. William Mennies School on the southern side of Grant Avenue, across from plaintiffs' property. The site chosen was on a portion of land with a higher elevation than both Grant Avenue and the Russo farmland across the street. The Board hired Kahley, an architect, to design the building, advise the Board, and supervise construction. He also was to review and approve requests for payment by the contractors.

The Board also hired Daniel W. Jacobs, P.E. and Lippincott Engineering Associates as structural engineers to perform tests and recommend a design to ensure a proper drainage system. Lippincott recommended to Kahley that the construction plans include one or two drainage basins to handle runoff of rainwater.

In March 1978, the State Department of Education approved the building plans, and construction began. In May 1978, the Board signed an American Institute of Architects (AIA) standard-form contract with Art Anderson, under which that company would act as general contractor, responsible for all construction work. Under the contract, Anderson was to be paid, every month, 90% of the amount earned in the prior month; on "Substantial Completion," 100% of the money was to be paid, less retainage "for all incomplete Work and unsettled claims." The entire unpaid balance was to be paid when the work was completed and a final certificate of payment was filed.

On September 5, 1979, the State Department of Education issued an Occupancy Permit because its "inspection of the project

indicates that the building is substantially completed." Several days later, a Certificate of Substantial Completion, an AIA standard form, was issued by Kahley to the Board because "construction is sufficiently complete ... so the owner can occupy or utilize" the building "for the use for which it is intended." Since September 1979, regular elementary school classes have been held in the building. On April 11, 1980, a request for final payment was submitted to the Board with a certification by Kahley that the project was 100% complete. Also on that date, an invoice was filed by Art Anderson seeking, pursuant to the contract, 100% of payment less retainage. In accordance with the contract, the surety consented to the release of final payment, less retainage.

Although the building was substantially completed in September 1979, a "punch list" of items that required completion was compiled, including replacement of damaged ceiling tiles, cleaning carpets, caulking doors, and installing toilet partitions. By November 7, 1980, most of these items were completed, and the punch list was fully completed by February 19, 1981.

The construction of the new school, however, allegedly caused damage to the plaintiffs' property. Their expert, Alan Cohen, stated that the contractor and architect negligently ignored the design specifications and constructed the drainage basins improperly. Instead of flowing into the basins, rainwater would run down the driveway, onto Grant Avenue, combine with the other water that Grant Avenue's inadequate drainage could not handle, and flood the Russo fields.

Thomas Russo testified at his deposition that

I started seeing water in the fields that ... I had not seen before not too long after the School was built.... I do not remember if it was the first year or the first growing season or the ... beginning of the next growing season.... A short time frame after the school was built.

Mario Russo described the early damage in 1980 and 1981 as "general water erosion. It was very evident that we had gullies through the ... property. We also had standing water and as a result, very poor crops. Bare areas without crops wherever the water laid." Plaintiffs explained, however, that Vineland was

suffering through a three-year dry spell that started around the time that the school was completed, and that therefore the flooding and damages were minimal in those early years. In the mid–1980s, the rains returned and the flooding worsened. By 1987, the floodwaters washed off the topsoil and left the farmland with an inferior layer of soil. Eventually, the Russo crops suffered from water rot and were severely damaged. Specifically, plaintiffs claim that the flood waters resulted in soil erosion, soil-nutrient depletion, decreased crop production and a diminution in value of their property.

At one point, plaintiffs had constructed a dike to protect the farmlands, but that resulted in worse floods on Grant Avenue, so it was removed. Later, plaintiffs constructed a berm on its property alongside South East Avenue to prevent the runoff from that road from flooding its property.

Thomas Russo spoke to several city officials in an attempt to remedy the problem. On August 24, 1987, he sent the following letter to the Mayor of Vineland:

Enclosed please find two copies of letters sent from our farming operation. After many phone calls to your office, I am confused about your casual attitude towards the problem.

We can no longer allow this situation to continue. We are again asking for you to come to the office as soon as possible.

Your immediate attention to this situation will be appreciated.

The record does not include the letters enclosed with the letter of August 24, 1987. Plaintiffs contend that their letter served as a notice of claims, a prerequisite to any suit against governmental entities under the Tort Claims Act.

On June 11, 1990, as the flood damage intensified, plaintiffs filed an official notice of claim with the City and the Board. On July 18, 1990, plaintiffs filed a twelve-count complaint against the City, the Board, Lippincott, Daniel Jacobs, Kahley and several "John Doe" defendants including the contractor. (The complaint ultimately was amended to replace one John Doe with Art Anderson).

Plaintiffs asserted both tort claims and claims for inverse condemnation against the City and Board. They also sought a

preliminary injunction against both to correct the drainage problem, as well as damages. Plaintiffs asserted two claims against Kahley: negligent design and negligent construction of the school property. Plaintiffs also alleged negligence against Lippincott and Jacobs for their design and construction of the drainage. Finally, the plaintiffs sought damages from Art Anderson for negligent construction of the school.

On August 3, 1990, the trial court ordered the City to construct a detention basin on Grant Avenue between plaintiffs' property and the property of the Board. The City complied and the water problem on Grant Avenue ceased.

In March 1991, the City commenced a separate suit, seeking an order compelling Russo to remove the berm that Russo had built along South East Avenue. Russo counterclaimed, arguing that South East Avenue constituted a dangerous condition that caused additional flooding on its lands. Those claims have been consolidated with this case.

In May 1991, Lippincott and Daniel W. Jacobs moved for summary judgment on the basis of the statute of repose, *N.J.S.A.* 2A:14–1.1, which the trial court granted, and they were therefore dismissed from the suit. The trial court, however, denied Kahley's motion for summary judgment on the basis of the statute of repose. While conceding that other courts had looked to "substantial completion" as the date from which to calculate the bar imposed by statutes of repose, the court was persuaded that, "as to the work of a supervising architect, that his work is not completed until in fact he has issued a final Certificate for Payment." Thus, the court computed the date of final completion from February 20, 1981, and found that the ten-year statute of repose did not bar plaintiffs' claims.

In April 1993, the trial court granted summary judgment to all of the remaining defendants, including Kahley. Deeming each claim to have arisen when the first injury to plaintiffs became apparent, the court reasoned that every claim accrued in 1980 or 1981, nearly ten years before suit was filed, and therefore each

was barred by *N.J.S.A.* 2A:14–1, the six-year statute of limitations and, with respect to the claims against the City and Board, each was also barred by the notice provisions of the Tort Claims Act. The trial court additionally held that Art Anderson, unlike Kahley, would be protected by the statute of repose since that statute began to run, as against Art Anderson, from the date of substantial completion, more than ten years before suit was filed. The court decided that substantial completion occurred in September 1979, when the Commissioner of Education certified that the building was ready for occupancy. The court found that the "punch list" did not affect substantial completion. Additionally, the trial court held that the City owed no duty to plaintiffs to maintain or provide an adequate drainage system.

Plaintiffs appealed from the grant of summary judgment in favor of the City, the Board, Kahley and Art Anderson. The Appellate Division reversed, holding that "a separate cause of action accrued with each incursion of floodwater," *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 280 *N.J.Super.* 320, 326, 655 *A.*2d 447 (1995), and that plaintiffs could pursue claims against the City and the Board for each flood occurring within the limitations period, or at least those for which plaintiffs satisfied the notice provisions of the Tort Claims Act.

Concerning plaintiffs' claims of inverse condemnation against the Board and the City, the Appellate Division observed that *N.J.S.A.* 2A:14–1 required plaintiffs to bring their actions within six years after the accrual of their claims. *Id.* at 327, 655 *A.*2d 447. The court held that plaintiffs, claims continued to accrue as long as the Board's conduct caused the plaintiffs' property to be subject to continual flooding. *Ibid.* The court ruled that plaintiffs were entitled to recover for injuries amounting to takings which their property sustained after July 18, 1984, six years prior to the date on which they filed their complaint. *Ibid.* The Appellate Division, however, declined to decide whether the alleged flooding amounted to a taking by either the Board or the City. *Ibid.* n. 3.

The Appellate Division determined that this theory of separate causes of action for each flood also applied to claims against Kahley and Art Anderson. *Russo Farms, supra,* 280 *N.J.Super.* at 328, 655 *A.*2d 447. The Appellate Division further held that the statute of repose, *N.J.S.A.* 2A:14–1.1, did not begin to run until the "date of full completion" of all construction when the contractor "has fully performed all of its contractual obligations, completely furnished all of its agreed services, and entirely completed the construction project." *Id.* at 330–31, 655 *A.*2d 447. The court held that full completion did not occur until February 1981, less than ten years before suit was filed. *Id.* at 330, 655 *A.*2d 447. Thus, the statute of repose was no bar, and plaintiffs could continue to assert their claims against Kahley and Anderson for damage from floods within the statutory period of six years.

Defendants all sought certification, challenging the "continuing tort" theory accepted by the Appellate Division. Both private defendants also challenged the Appellate Division's interpretation that the statute of repose commenced to run on final completion of construction. We granted certification to consider each of those claims. 142 *N.J.* 457, 663 *A.*2d 1363 (1995).

## II

### A

We consider first plaintiffs' claims against the public entities. Plaintiffs have made three claims against both the Board and the City. They asserted that each was liable for maintaining a dangerous condition on their property, (the Board's school and the City's Grant Avenue drainage system), each was liable for maintaining a nuisance, and each was liable for taking property by inverse condemnation. The first two claims, dangerous condition and nuisance, are governed by the Tort Claims Act. *N.J.S.A.* 59:4–2 provides that a public entity may, subject to the conditions of the Act be liable for "dangerous conditions of property." While the statute does not refer to nuisance liability, this Court has held that

"public entity liability for nuisance is recognized [as a dangerous condition of property] under the Tort Claims Act." *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 *N.J.* 582, 593, 449 *A.2d* 472 (1982). Under *N.J.S.A.* 59:8–8 of the Tort Claims Act, the claims will be barred if suit is not filed within two years after accrual, or if notice of claim is not given within ninety days. "It is intended that the term accrual of cause of action shall be defined in accordance with existing law in the private sector." *N.J.S.A.* 59:8–1 cmt.

The central question is when the respective claims accrued. "The Legislature has not specified when the cause of action shall be deemed to have accrued and the matter has therefore been left entirely to judicial interpretation and administration." *Rosenau v. City of New Brunswick*, 51 *N.J.* 130, 137, 238 *A.2d* 169 (1968) (citing *Fernandi v. Strully*, 35 *N.J.* 434, 449, 173 *A.2d* 277 (1961)). The traditional rule is that a cause of action accrues on the date when " 'the right to institute and maintain a suit' ", first arises. *Rosenau, supra,* 51 *N.J.* at 137, 238 *A.2d* 169 (quoting *Fredericks v. Town of Dover,* 125 *N.J.L.* 288, 291, 15 *A.2d* 784 (E. & A.1940)). That phrase refers to the "combination of facts or events which permits maintenance of a lawsuit; the time of occurrence of the last of these requisite facts is thereby made the critical point of initial inquiry." Note, *Developments in the Law—Statutes of Limitations,* 63 *Harv. L.Rev.* 1177, 1200 (1950) (hereinafter "Note"). A claim for negligence accrues "when [plaintiff] suffers actual consequential damage or loss from the defendant's negligence." *Rosenau, supra,* 51 *N.J.* at 138, 238 *A.2d* 169; *see also Diamond v. New Jersey Bell Tel. Co.,* 51 *N.J.* 594, 596, 242 *A.2d* 622 (1968)(same); W. Page Keeton et al., *Prosser & Keeton on Torts,* § 30, at 165 (5th ed.1984); Note, *supra,* 63 *Harv. L.Rev. at* 1201 ("[S]ince harm is an element essential to a negligence action, the statutory period should not commence before the incidence of the harm.")

By 1980 or 1981, plaintiffs were aware of the flooding, of damage to their crops and property, and the causal connection

between the flooding, the damage and the siting of the school. Hence, defendants assert that even under the six-year statute of limitations, plaintiffs' claims are time-barred. Plaintiffs, however, invoke the "continuing tort" doctrine. Under that doctrine, they claim that they suffered a new injury from a new tort each time a flood occurred, and that they may maintain a suit for the damages that resulted from each flood.

## B

The continuing tort doctrine is an established doctrine in New Jersey and other states. The doctrine frequently is cited in cases in which the plaintiff alleges trespass or nuisance claims against the defendant. The applicability of the doctrine to this case, therefore, is best understood in the context of plaintiffs' nuisance claims against the City and the Board.

Plaintiffs claim that the Board and City are liable under a nuisance theory because the Board and City's use of their property has invaded plaintiffs' use and enjoyment of their land. The invasion was a physical invasion, which ordinarily sounds in trespass, but "the flooding of the plaintiff's land, which is a trespass, is also a nuisance if it is repeated or of long duration." *Restatement (Second) of Torts* § 821D, cmt. e (1977); *cf. Hennessy v. Carmony*, 50 *N.J. Eq.* 616, 618, 25 *A.* 374 (Ch. 1892)(throwing water on another's property once constitutes a trespass, "to continue to do so constitutes a nuisance"). Plaintiffs could have pled either claim, but chose to plead nuisance.

When a court finds that a continuing nuisance has been committed, it implicitly holds that the defendant is committing a new tort, including a new breach of duty, each day, triggering a new statute of limitations. That new tort is an "alleged present failure" to remove the nuisance, and "[s]ince this failure occurs each day that [defendant] does not act, the [defendant's] alleged tortious inaction constitutes a continuous nuisance for which a cause of action accrues anew each day." *Rapf v. Suffolk County*,

755 *F.*2d 282, 292 (2d Cir.1985). Essentially, courts in those cases impose a duty on the defendant to remove the nuisance. *Accord Gowing v. McCandless,* 219 *Kan.* 140, 547 *P.*2d 338, 343 (1976) ("[T]he principle upon which one is charged as a continuing wrongdoer is that he has a legal right, and is under a legal duty, to terminate the cause of the injury."); *Prosser and Keeton on Torts, supra,* § 13, at 83 ("In such a case, there is a continuing wrong so long as the offending object remains."). Because the defendant has a duty to remove the nuisance, and because the defendant's failure to remove the nuisance is a breach of that duty, each injury is a new tort. The plaintiff is therefore able to collect damages for each injury suffered within the limitations period. *Stanley Dev. Co. v. Township of Millburn,* 26 *N.J.Super.* 328, 331–32, 97 *A.*2d 743 (App.Div.1953) (citing *Morey v. Essex County,* 94 *N.J.L.* 427, 110 *A.* 905 (E. & A.1920)).

Plaintiffs contend that the inadequate drainage on the school property and Grant Avenue constituted a "continuing nuisance," thereby allowing them to maintain suit against the City and Board for all injuries suffered within the appropriate limitations period. Plaintiffs rely on several early cases in which the courts determined that, for the purposes of the statute of limitations, the nuisance was a continuing tort. In *Delaware & Raritan Canal Co. v. Lee,* 22 *N.J.L.* 243 (Sup.Ct.1849), the defendant constructed a culvert on its land (in 1833) that would carry away water from plaintiff's land. *Id.* at 244. However, the culvert was defective and caused periodic flooding on the plaintiff's land because it was unable to carry all of the water. In 1848, fifteen years later, the plaintiff filed suit for nuisance, alleging that the defendant's use of its property was infringing on the use and enjoyment of his property. The court held that the action was not barred, because "[i]t is a continuing nuisance, for which it is well settled that a plaintiff may receive damages for a period not exceeding six years, though the obstruction which occasioned the injury is of much longer continuance." *Id.* at 251; *accord Delaware & Raritan Canal Co. v. Wright,* 21 *N.J.L.* 469, 470 (Sup.Ct.1848); *see also Morey, supra,* 94 *N.J.L.* 427, 430, 110 *A.* 905 (E. & A.1920)

(holding that where county appropriated strip of land from plaintiff in 1912 to use as part of road and plaintiff did not sue until after limitations period, that "the constant repetition of the defendant's unlawful acts, its persistence in its wrongful occupation of plaintiff's land, constituted a continuous trespass, and the plaintiffs were entitled to recover from the defendant the damages sustained by them for all of the six years preceding the institution of the suit."); *Church of the Holy Communion v. Paterson Extension R.R.*, 66 *N.J.L.* 218, 49 *A.* 1030 (E. & A.1901) (holding that damage sustained as result of defective construction of church wall constituted continuing tort).

Although defendants assert that the continuing tort doctrine is an archaic, out-of-date doctrine, the doctrine continues to be applied. *See Sheppard v. Township of Frankford,* 261 *N.J.Super.* 5, 8–9, 617 *A.2d* 666 (App.Div.1992) (noting that disposal of water runoff onto plaintiff's property created continuing nuisance); *Biglioli v. Durotest Corp.,* 44 *N.J.Super.* 93, 104, 129 *A.2d* 727 (App.Div.1957)(holding that negligent exposure of employee to occupational toxin over long period of time is continuing tort), *aff'd,* 26 *N.J.* 33, 138 *A.2d* 529 (1958); *Barberi v. Bochinsky,* 43 *N.J.Super.* 186, 189, 128 *A.2d* 1 (App.Div.1956)(finding that wall on plaintiff's land constituted continuous trespass and was actionable although six years had passed since wall's construction).

The facts of this case are remarkably similar to *Wright, supra,* and *Lee, supra,*—all involve periodic flooding due to defective construction of a drainage system. Many other courts have agreed that intermittent flooding of that nature constitutes a continuing tort. *See, e.g., Rapf, supra,* 755 *F.2d* at 292 (holding that county's failure to maintain beach groins, leading to flooding and erosion was continuing nuisance); *Kulpinski v. City of Tarpon Springs,* 473 *So.2d* 813 (Fla.Dist.Ct.App.1985)(finding that flood was continuing nuisance); *Gleaton v. City of Atlanta,* 131 *Ga.App.* 399, 206 *S.E.2d* 46 (1974)(same); *Meyers v. Kissner,* 149 *Ill.2d* 1, 171 *Ill.Dec.* 484, 594 *N.E.2d* 336 (1992) (holding that erosion due to defendant's maintenance of levies was continuing

nuisance); *Gowing, supra,* 219 *Kan.* 140, 547 *P.*2d 338 (holding that flooding of fields was continuing nuisance); *Hodgeson v. Ragnone,* 52 *Mich.App.* 411, 217 *N.W.*2d 395 (1974) (finding that sewer overflow causing flood was continuing nuisance); *Meruk v. City of New York,* 223 *N.Y.* 271, 119 *N.E.* 571 (1918) (holding that flooding from sewer was continuing nuisance); *Wilson v. McLeod Oil Co.,* 327 *N.C.* 491, 398 *S.E.*2d 586 (1990) (holding that polluted water seeping into well was continuing nuisance); *Graybill v. Providence Township,* 140 *Pa.Cmwlth.* 505, 593 *A.*2d 1314 (1991)(holding that flooding of plaintiff's fields was continuing nuisance), *aff'd,* 533 *Pa.* 61, 618 *A.*2d 392 (1993).

"In nuisance actions it is important, for statute of limitations purposes, to ascertain whether the invasion or interference is 'permanent' or 'continuous.'" *Beatty v. Washington Metro. Area Transit Auth.,* 860 *F.*2d 1117, 1122 (D.C.Cir.1988). Professor Dobbs explains the distinction between those two types of nuisances:

> In theory, if a nuisance is deemed permanent, there is only one unceasing invasion of the plaintiff's interests and only one cause of action. This necessarily arises when the invasion first began or was first manifest. The statute of limitations on the one cause of action must, then, begin running from the time the invasion began, or from the time it became manifest. In contrast, if the nuisance or trespass is "temporary" or "continuous," a new cause of action arises day by day or injury by injury, with the result that the plaintiff in such a case can always recover for such damages as have accrued within the statutory period immediately prior to suit.
> [Dan B. Dobbs, *Law of Remedies,* § 5.4, at 343 (1973).]

*Accord Provident Mut. Life Ins. Co. v. City of Atlanta,* 864 *F.Supp.* 1274, 1284–85 (N.D.Ga.1994); *Baker v. Burbank–Glendale–Pasadena Airport Auth.,* 39 *Cal.*3d 862, 218 *Cal.Rptr.* 293, 296–97, 705 *P.*2d 866 (1985), *cert. denied,* 475 *U.S.* 1017, 106 *S.Ct.* 1200, 89 *L.Ed.*2d 314 (1986); *City of Sioux Falls v. Miller,* 492 *N.W.*2d 116, 118–19 (S.D.1992); 58 *Am.Jur.2d Nuisances* § 307 (1989).

Professor Dobbs has identified three factors that courts consider in distinguishing between continuing and permanent nuisances:

(1) Is the source of the invasion physically permanent, i.e., is it likely, in the nature of things, to remain indefinitely?

(2) Is the source of the invasion the kind of thing an equity court would refuse to abate by injunction because of its value to the community or because of relations between the parties?

(3) Which party seeks the permanent or prospective measure of damages?

[Dobbs, *supra*, § 5.4, at 338.]

Several jurisdictions use this test, including South Dakota, *City of Sioux Falls, supra*, 492 *N.W.*2d at 119; the District of Columbia, *L'Enfant Plaza East, Inc. v. John McShain, Inc.*, 359 *A.*2d 5 (D.C.1976); and the D.C. Circuit, *Beatty, supra*, 860 *F.*2d at 1122–23. Kansas follows a similar rule, classifying nuisances as recurring and not barred by the statute of limitations if the nuisance is either abatable or "remedied at reasonable expense." *Gowing, supra*, 547 *P.*2d at 343. Other jurisdictions have adopted analogous standards. California, for example, focuses on permanency: "if a nuisance is a use which may be discontinued at any time, it is considered continuing in character." *Baker, supra*, 218 *Cal.Rptr.* at 297, 705 *P.*2d at 870; *Wilshire Westwood Assoc. v. Atlantic Richfield Co.*, 20 *Cal.App.*4th 732, 24 *Cal.Rptr.*2d 562, 569 (1993)("The crucial test of a continuing nuisance is whether the offensive condition can be discontinued or abated at any time."). Missouri focuses on whether the condition is abatable. *Frank v. Environmental Sanitation Mgmt., Inc.*, 687 *S.W.*2d 876, 883 (Mo. 1985) (holding nuisance is permanent "if abatement is impracticable or impossible.").

■ We agree with Professor Dobbs and the jurisdictions that hold a nuisance is continuing when it is the result of a condition that can be physically removed or legally abated. In such a case, it is realistic to impute a continuing duty to the defendant to remove the nuisance, and to conclude that each new injury includes all elements of a nuisance, including a new breach of duty. On the other hand, when the nuisance cannot physically be removed, it is unfair to impose a continuing, impossible to fulfill duty to remove the nuisance; when a court will not order defendant to abate the nuisance, it is inconsistent to recognize a duty to do so.

While our prior cases do not explicitly adopt this test, at least some have based their holdings on whether the nuisance is perma-

nent or abatable, and hence whether the defendant has a continuing duty to abate it. Thus, in *Barberi, supra,* the Appellate Division determined that a wall constituted a continuing trespass because defendant "remained under the obligation of removing or abating it." 43 *N.J.Super.* at 191, 128 *A.*2d 1. *Accord Rowland v. New York Stable Manure Co.,* 88 *N.J. Eq.* 168, 175, 101 *A.* 521 (Ch.1917) (finding that abatable odor persists "as long as the defendant sees fit to impose upon them. Each day's continuance is a new or fresh nuisance."); *State v. Sommers Rendering Co.,* 66 *N.J.Super.* 334, 342, 169 *A.*2d 165 (App.Div.1961) (same)

■ The nuisance claim against the City was a continuing one. Once suit was filed, the nuisance "was removed without undue difficulty. Therefore, 'in the nature of things' it was not likely to remain indefinitely." *L'Enfant Plaza East, supra,* 359 *A.*2d at 6. Additionally, the nuisance was not legally permanent because the trial court granted an injunction to abate it. Because the nuisance was not permanent and a court could (and did) order the City to abate it, we find that the City had a continuing duty to abate the nuisance. As a result, each new injury suffered by plaintiffs was a new tort because each contained every element of a tort, including a new breach of duty.

■ The record is less clear about the nuisance claim against the Board, because the trial court never decided whether to order the Board to abate the nuisance, and because there is no evidence about the physical permanence of the flood-causing construction. On remand, the trial court should determine whether the nuisance claim attributable to the Board is physically and legally permanent or whether it could have been abated by installing a new or modified drainage system. If it could have been abated, then plaintiffs' nuisance claim against the Board should be reinstated. *Cf. City of Sioux Falls, supra,* 492 *N.W.*2d at 119 (holding that sewer overflow is not continuous because physically permanent and because it is "doubtful" that court would order nuisance abated).

Defendants contend that the continuing-tort doctrine is a legal fiction crafted to protect plaintiffs from the unfairness of statutes of limitation, and that it is no longer needed because the discovery rule accomplishes the same result. However, the doctrine that we apply today is not an exception that permits evasion of the statute of limitations, but rather an "accrual" test that allows claims to the extent that they have accrued within the limitations period.

### C

Plaintiffs also claim that the City and Board are liable under *N.J.S.A.* 59:4–2 for creating a "dangerous condition." Plaintiffs assert that the Board and City both had actual or constructive notice of the dangerous condition of their property, the poorly designed school drainage and the poorly designed storm-drain system, respectively. Plaintiffs claim that this dangerous condition caused injury. *Cf. Saldana v. DiMedio,* 275 *N.J.Super.* 488, 646 *A.2d* 522 (App.Div.1994)(allowing suit against Camden alleging dangerous condition liability when buildings were deemed to be in dangerous condition causing fire to begin and spread onto surrounding neighbor's property and cause damage).

Plaintiffs' "continuing tort" theory also applies to those claims. Plaintiffs assert that the City's and the Board's liability accrues at the time of injury, provided that the land is then in a dangerous condition. The focus is not on a breach of duty, but on the conditions at the time of the injury. Because of that focus, each injury allegedly constitutes a new tort, because each injury contains all of the elements of a tort, without any need to refer to prior actions to establish liability.

That analysis is similar to the analysis applied to other torts. Battery, for example, is established by "proof of an unauthorized invasion of the plaintiff's person, even if harmless.... Any non-consensual touching is a battery." *Perna v. Pirozzi,* 92 *N.J.* 446, 460–61, 457 *A.2d* 431 (1983). If an individual assaults another person on a continuing basis extending over several years,

each new assault is a battery, because the attack itself includes every element of a new tort. If the first attack is barred by the statute of limitations, more recent claims may not be barred because each asserts a new tort. Trespass has a similar rule. Each new trespass contains all of the requisite elements of the tort, an invasion of property with intent: "[A] defendant, taking a short cut, drives across a corner of the plaintiff's property and does so not once but every day of the week. Each new day brings a new trespass on which the statute of limitations runs separately." Dobbs, *supra*, § 5.4, at 335 (1973).

 Plaintiffs' claim of dangerous condition liability is similar to trespass and battery: each new injury resulting from a dangerous condition includes every element of a new tort—injury and the current existence of a dangerous condition. Therefore, the statute of limitations for each injury runs from the date of that injury. Thus, plaintiffs may maintain a dangerous condition suit for each injury suffered within the time limits imposed by the Tort Claims Act. On remand, plaintiffs, in order to prove that the public entities are liable for maintaining a "dangerous condition," will have to establish not only the substantive elements set forth in *N.J.S.A.* 59:4–2, but will also have the heavy burden of establishing that defendants' conduct was palpably unreasonable.

### D

*N.J.S.A.* 59:8–8 of the Tort Claims Act provides:

The claimant shall be forever barred from recovery against a public entity if:

 a. He failed to file his claim with the public entity within *90 days of accrual*

 . . . .

 b. *Two years have elapsed since the accrual of the claim* . . . .

[Emphasis added.]

 Plaintiffs sent a letter to the Mayor of Vineland on August 24, 1987, filed an official notice of claim with the City on June 11, 1990, and filed their complaint on July 18, 1990. With respect to claims against the City, the critical issue is whether the letter sent to the mayor on August 24, 1987 was a valid notice, satisfying

*N.J.S.A.* 59:8–8a. If so, then all claims accruing since July 1988 would be allowed under *N.J.S.A.* 59:8–8a. If not, then the first notice of claim was not until June 1990 and all claims accruing before March 1990 are barred under *N.J.S.A.* 59:8–8a. Because the attachments to that letter were not included in the record we will assume without deciding, as did the lower courts, that the August 24, 1987 letter constituted a notice that was sufficient. Because plaintiffs filed suit on July 18, 1990, any claim accruing against the City prior to July 18, 1988 would be barred under *N.J.S.A.* 59:8–8b. Consequently, plaintiffs' nuisance and other tort claims against the City that are not barred by the two-year period of limitations, *N.J.S.A.* 59:8–8, are claims for damage, if any, sustained between July 18, 1988 and May 1990, when the flooding ceased.

■ Finally, plaintiffs' counterclaim alleging that the City was liable for a dangerous condition on South East Avenue will be barred by the Tort Claims Act unless they filed a notice of claim before filing the counterclaim. *See Department of Transp. v. PSC Resources, Inc.,* 159 *N.J.Super.* 154, 159–61, 387 *A.*2d 393 (Law Div.1978)(holding that Tort Claims Act notice provisions apply to counterclaims). If plaintiffs did file a notice of claim before asserting the counterclaim, then the claim will be allowed to the extent that it accrued within ninety days of the notice and within two years of the filing of the action. *See Atlantic City Hospital v. Finkle,* 110 *N.J.Super.* 435, 265 *A.*2d 853 (Law Div.1970)(holding that counterclaim will be deemed timely if complaint was filed within limitations period).

■ Because no notice of claim was filed with the Board until June 11, 1990, *N.J.S.A.* 59:8–8a bars all of plaintiffs' claims against the Board except for those claims that accrued within ninety days prior to that date.

### E

The City and Board advance two arguments in support of a dismissal of the tort claims asserted against them. First, the City

and Board both contend that the doctrine of "avoidable consequences" should bar certain of plaintiffs' claims. Additionally, the City contends that, even if the statute of limitations or the Tort Claims Act do not bar plaintiffs' claims, it should nonetheless be granted summary judgment because it owed no duty to the plaintiffs to update its drainage system.

The City and Board both argue that the doctrine of "avoidable consequences" should bar certain of plaintiffs' claims and limit any damage award. Plaintiffs purchased seven of the affected lots between 1985 and 1989, after plaintiffs were aware of the flooding and its increased intensity. Defendants argue that as a matter of law plaintiffs should be precluded from collecting damages for injury suffered to these lots.

The doctrine of "avoidable consequences," otherwise known as the duty to mitigate damages, is based on the premise that "a plaintiff may not recover damages for injuries which he may have avoided." *Barry v. Coca Cola Co., 99 N.J.Super.* 270, 275, 239 *A.2d* 273 (Law Div.1967). Under that doctrine, recovery for harm is diminished due to the injured person's actions and failure to exercise reasonable care to avoid the consequences of a wrongful action. *Restatement (Second) of Torts,* § 918, cmt. a (1977).

Defendants allege that plaintiffs' purchase of new lands after the onset of serious flooding establishes that plaintiffs failed to exercise reasonable diligence and ordinary care, because they purchased those farmlands with knowledge of the flooding condition and resultant damage that occurred since 1980. Indeed, most of the lands were purchased after 1985 when there is no question but that plaintiffs knew of the dangerous flooding condition. Based on those purchases, defendants assert that plaintiffs unfairly seek to increase their damages because the new lands also became flooded.

As opposed to contributory negligence, the doctrine of avoidable consequences "normally comes into action when the

injured party's carelessness occurs *after* the defendant's legal wrong has been committed." *Ostrowski v. Azzara*, 111 *N.J.* 429, 438, 545 *A.*2d 148 (1988). Although every tort had not yet occurred by early 1985, plaintiffs knew that their lands and crops were being damaged by the water flowing from Grant Avenue onto their land. On remand, the trial court should determine whether the doctrine of avoidable consequences affects plaintiffs' damage claims.

### F

Further, the City claims that it is entitled, as a matter of law, to a dismissal of plaintiffs' tort claims because it owed no duty to update its drainage systems. The City cites this Court's decision in *Barney's Furniture Warehouse of Newark, Inc. v. City of Newark*, 62 *N.J.* 456, 469–70, 303 *A.*2d 76 (1973) in support of this contention. As a preliminary matter, we observe that plaintiffs' claim for inverse condemnation does not depend on any independent duty owed by the City to update its storm-sewer system. Thus, our discussion of this question is relevant only to plaintiffs' dangerous condition and nuisance claims.

In *Barney's, supra*, plaintiffs sued the City of Newark for damages suffered from periodic flooding. *Id.* at 457, 303 *A.*2d 76. The city did have a sewer system, but increased industrial and airport development had rendered the sewers inadequate and caused flooding. *Id.* at 458–59, 303 *A.*2d 76. The Court found that, as in this case, the floodwaters "consist[ ] of either precipitation or back-flow of surface water from the meadows which is unable to enter the sewers or ditches because they are already full." *Id.* at 462, 303 *A.*2d 76. The Court concluded, in accordance with a majority of jurisdictions, that the city could not be held liable in damages for floods resulting from "a gradually increasing functional incapacity of the sewer system." *Id.* at 469, 303 *A.*2d 76. The Court observed that its decision was based on the law as it existed prior to the effective date of the Tort Claims Act. *Id. at* 470 n. 4, 303 *A.*2d 76.

Although the City of Vineland relies on *Barney's*, plaintiffs contend that the case involved pre-Tort Claims Act law, that *Barney's* no longer applies after the enactment of that legislation, and that the City's conduct in designing the sewer system must be tested under the rules of the Tort Claims Act that govern "Plan or design immunity," *N.J.S.A.* 59:4–6.

We have briefly discussed that issue in two of our cases. In *Birchwood Lakes, supra*, an organization representing lake-area residents brought an action against a borough for operating a sewage plant that was polluting the lake with effluent. We held that the borough was not immune from liability for injuries it caused due to negligent operation of the plant; we remarked that that holding "is consistent with *Barneys*," where the Court held that "although a municipality is not liable for the gradually increasing functional incapacity of its sewer system, it remains liable for negligent operation or repairs and would be liable if in actual operation the system expels artificially collected sewage." *Birchwood Lakes, supra*, 90 *N.J.* at 602, 449 *A.*2d 472.

However, in *Levin v. County of Salem*, 133 *N.J.* 35, 47 n. 1, 626 *A.*2d 1091 (1993), we discussed liability for defectively designed storm drains and noted that "the New Jersey [Tort Claims] Act would immunize the defective design of a storm drain under *N.J.S.A.* 59:4–6," implying that plan or design immunity under the statute, rather than *Barney's*, was the relevant test.

Generally, "[t]he purpose of the Tort Claims Act was to establish immunities for municipalities; it was not designed to create liability." *Woodsum v. Township of Pemberton*, 172 *N.J.Super.* 489, 517, 412 *A.*2d 1064 (Law Div.1980), *aff'd*, 177 *N.J.Super.* 639, 427 *A.*2d 615 (App.Div.1981). "Consequently, if an immunity was in existence prior to the Tort Claims Act, it remains available to a municipality" under the Tort Claims Act. *Ibid.* (citing *N.J.S.A.* 59:2–1(b) cmt.) Therefore, the holding of *Barney's* is still a correct principle of law.

However, in *Barney's,* the Court granted immunity to the City for its failure to update the sewer system because the decision to construct the system was "grounded in governmental judgment and discretion." *Barney's, supra,* 62 *N.J.* at 469, 303 *A.*2d 76. Similarly, the Tort Claims Act's plan or design immunity is granted because such decisions are "an example of the type of highly discretionary governmental activity which the courts have recognized should not be subject to the threat of tort liability." *N.J.S.A.* 59:4–6 cmt. Indeed, we noted in *Barney's* that the new Tort Claims Act "seems intended to codify existing case law." *Barney's, supra,* 62 *N.J.* at 470, n. 4, 303 *A.*2d 76.

Under *Barney's,* as well as under the Tort Claims Act, the City may establish plan or design immunity for its original construction of the drainage system. Once it does, "no subsequent event or change of condition shall render a public entity liable on the theory that the existing plan or design of public property constitutes a dangerous condition." *N.J.S.A.* 59:4–6 cmt.

In this case, therefore, the City will not be liable for a failure to improve the inadequate drainage system on Grant Avenue *provided that* it can establish that its original design deserves immunity under the standards of *N.J.S.A.* 59:4–6. While the City pled this defense in its answer and claimed adherence to government plans and specifications, it has not presented any evidence about its initial decision establishing the drainage system. Accordingly, the City has not met its burden of establishing immunity. *Birchwood Lakes, supra,* 90 *N.J.* at 599, 449 *A.*2d 472 (citing *Ellison v. Housing Auth.,* 162 *N.J.Super.* 347, 351, 392 *A.*2d 1229 (App.Div.1978)). Summary judgment for the City is therefore inappropriate unless, on remand, the City can meet the burden of proof required by the immunity provisions of the Tort Claims Act.

### G

As an alternative to their tort claims against the City and the Board, plaintiffs also assert claims of inverse condemnation

against the public entities. Because the City's construction of a new drainage system in 1990 eliminated the flooding problem, plaintiffs are not claiming that their fields were permanently flooded, but rather that, for several years, the flooding occurred "each and every time a cloud burst occur[red]." The parties have primarily addressed plaintiffs' tort claims. Neither side has addressed the inverse condemnation claims in any detail or presented any specific evidence about them. The public entities have not addressed the inverse condemnation claims in their petitions for certification nor have plaintiffs discussed the claims in their brief in opposition to the public entities' petitions. Based on the record before it, the Appellate Division did not "attempt to decide whether the flooding which plaintiffs allege amounts to a taking by either the Board of Education or the City or both." *Russo Farms, supra*, 280 *N.J.Super.* at 327 n. 3, 655 *A.2d* 447. Neither do we.

The Appellate Division, however, did find that the Tort Claims Act did not apply to plaintiffs' inverse condemnation claim; rather, it held that the six-year statute of limitations in *N.J.S.A.* 2A:14-1 applied and that it began to run anew after each flood. *Russo Farms, supra*, 280 *N.J.Super.* at 325, 655 *A.2d* 447. The Appellate Division relied on *Estate of McGrath v. New Jersey Dist. Water Supply Comm'n,* 224 *N.J.Super.* 563, 570, 540 *A.2d* 1350 (Law Div.1986), where that court briefly noted, without any citation, that "the Tort Claims Act does not apply to several causes of action, such as inverse condemnation and violation of civil rights."

Courts in other jurisdictions are split on whether statutory tort claims laws govern inverse condemnation claims. Some states have upheld the application of those laws, including notice of claim limitations, so long as the tort claims rule is reasonable. *See Wyoming State Highway Dep't v. Napolitano,* 578 *P.2d* 1342, 1348 (Wyo.)(citing other jurisdictions upholding such rules), *appeal dismissed* 439 *U.S.* 948, 99 *S.Ct.* 343, 58 *L.Ed.2d* 340 (1978); *see also City of San Jose v. Superior Ct.,* 12 *Cal.*3d 447, 115 *Cal.Rptr.* 797, 802, 525 *P.2d* 701 (1974), superseded by *Cal. Gov't Code*

§ 905.1; *Brownlow v. City of Calhoun,* 198 *Ga.App.* 710, 402 *S.E.*2d 788 (1991). Other states have determined that tort claims rules do not apply to inverse condemnation claims. Some have simply noted that inverse condemnation is not a tort claim but an equitable remedy, and therefore the "tort claims" law is expressly inapplicable. *E.g., Young v. Palm Beach County,* 443 *So.*2d 450, 452 (Fla.Dist.Ct.App.1984); *Borntrager v. County of Delaware,* 76 *A.D.*2d 969, 428 *N.Y.S.*2d 766, 767 (1980); *Wis. Retired Teachers Ass'n, Inc. v. Employe Trust Funds Bd.,* 195 *Wis.*2d 1001, 537 *N.W.*2d 400, 411 (Ct.App.), *review granted,* —— *Wis.*2d ——, 540 *N.W.*2d 200 (1995). Other courts have observed that, because the constitutional prohibition against taking property without compensation is "self-executing" and the basis of liability is not the tort claims law, the procedural constraints of the tort claims law do not apply to bar the claim. *E.g., Lerman v. City of Portland,* 675 *F.Supp.* 11, 14 (D.Me.1987), *aff'd,* 879 *F.*2d 852 (1st Cir.), *cert, denied,* 493 *U.S.* 894, 110 *S.Ct.* 243, 107 *L.Ed.*2d 193 (1989); *Dishman v. Nebraska Public Power Dist.,* 240 *Neb.* 452, 482 *N.W.*2d 580 (1992). Finally, other courts have relied on *Felder v. Casey,* 487 *U.S.* 131, 108 *S.Ct.* 2302, 101 *L.Ed.*2d 123 (1988), which held that state notice of claim provisions are inapplicable to actions brought under 42 *U.S.C.A.* § 1983 alleging violations of federal constitutional rights. *See Wolff v. Secretary of S.D. Game, Fish & Parks Dep't,* 544 *N.W.*2d 531 (S.D.1996); *Moore Real Estate, Inc. v. Porter County Drainage Bd.,* 578 *N.E.*2d 380, 381 (Ind.Ct.App.1991)("The Board may not use a state statute, the tort claims act, to trump the constitutional rights of Moore.").

In their petitions for certification and their briefs, neither party has addressed whether the Tort Claims Act or the six-year statute of limitations would apply to plaintiffs' inverse condemnation claims. Based on that record, we do not reach that issue.

## III

Each private defendant faces only one claim: negligence. Plaintiffs allege, with support from their expert witness, that

Kahley, the architect responsible for construction supervision, and Art Anderson, the contractor who constructed the school, negligently deviated from the design plans, violating their duty of due care. Plaintiffs further claim that that breach of duty proximately caused the injury to their land.

We reject the "continuing tort" theory insofar as it relates to this claim for negligent construction of the building. Kahley and Anderson allegedly breached their duty of due care only once, in 1980, while building the school. Their breach of duty occurred in 1980; injury resulted to plaintiffs in 1980 or 1981, at which time the tort accrued. After 1981, those two defendants never breached any new duty to the plaintiffs. Plaintiffs continued to suffer injury, but "a wrongful act with consequential continuing damages is not a continuing tort," and does not lengthen the statute of limitations. *Ricottilli v. Summersville Mem. Hosp.*, 188 *W.Va.* 674, 425 *S.E.*2d 629, 632 (1992).

It is only when the new injury results from a new breach of duty that a new cause of action accrues. "For there to be a continuing tort there must be a continuing duty." *Maslauskas v. United States,* 583 *F.Supp.* 349, 351 (D.Mass.1984)(holding that prisoner's suit against government for negligence leading to his incarceration is time-barred because government had no continuing duty to investigate causes of incarceration).

As we observed, *supra* at 103, 675 *A.*2d at 1086, there are instances when courts will find a continuing duty, resulting in a new cause of action and a new statute of limitations. In our view, however, Kahley and Art Anderson had no control over the school property after 1981 and breached no new duty after that time. That they never corrected the problem does not render the tort continuing. Their "mere failure to right a wrong and make plaintiff whole cannot be a continuing wrong which tolls the statute of limitations, for that it is the purpose of any lawsuit and the exception would obliterate the rule." *Fitzgerald v. Seamans,* 553 *F.*2d 220, 230 (D.C.Cir.1977). Thus, the new damages are simply continuing damages, not a new tort. As a result, the only

tort alleged is negligence, and that tort accrued in 1980–81 when the injury first occurred.

Plaintiffs further contend, however, that the "discovery rule" should have tolled the statute of limitations until it "learn[ed], or reasonably should [have] learn[ed], the existence of that state of facts which may equate in law with a cause of action." *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 426, 527 *A.*2d 66 (1987). They argue that the statute does not begin to run until the plaintiff has knowledge of "injury" suffered and "fault." *Lynch v. Rubacky*, 85 *N.J.* 65, 70, 424 *A.*2d 1169 (1981).

Plaintiffs claim that they did not "discover" the cause of action until 1985, when the damage first became severe and the real extent of the injury became apparent. However, "it is not necessary that the injured party have knowledge of the extent of injury before the statute begins to run." *P.T. & L Constr. Co. v. Madigan & Hyland, Inc.*, 245 *N.J.Super.* 201, 207, 584 *A.*2d 850 (App.Div.), *certif. denied*, 126 *N.J.* 330, 598 *A.*2d 888 (1991). In this case, several of the Russo plaintiffs testified that they noticed damage to their fields in 1981 soon after the school was built, indicating awareness of the causal link to the newly-built school. While knowledge about the school construction might not necessarily have yielded knowledge about the specific contractor and architect, it surely put plaintiffs on notice of a potential claim against the school and anyone involved in the construction process. We therefore conclude that the six-year statute of limitations bars any suit against Kahley and Art Anderson because those causes of action accrued when plaintiffs suffered injury, more than six years before commencement of this action.

## IV

We have already held that both private defendants are dismissed from this lawsuit because the statute of limitations has run. We also find that those claims are barred by the statute of repose. That issue appears to be one of first impression in New Jersey. Although the Appellate Division has determined that the date of

substantial completion is to be used for statute of limitations purposes, *Mahony–Troast Constr. Co. v. Supermarkets Gen. Corp.,* 189 *N.J.Super.* 325, 329, 460 *A.*2d 149 (App.Div.1983), no prior case has considered that question in the context of the statute of repose.

*N.J.S.A.* 2A:14–1.1 reads as follows:

No action whether in contract, tort, or otherwise to recover damages for any deficiency in the design, planning, supervision or construction of an improvement to real property, or for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction.

That statute, similar to those in many other states, was enacted in 1967, *L.* 1967, *c.* 5, § 1. We have discussed the origins and purposes of this statute on several occasions. *E.g., E.A. Williams, Inc. v. Russo Dev. Corp.,* 82 *N.J.* 160, 164–68, 411 *A.*2d 697 (1980); *O'Connor v. Altus,* 67 *N.J.* 106, 117–19, 335 *A.*2d 545 (1975); *Rosenberg v. Town of N. Bergen,* 61 *N.J.* 190, 194–98, 293 *A.*2d 662 (1972). Briefly, "[t]he purpose of the statute of repose was to limit the expanding liability of contractors, builders, planners, and designers." *Horosz v. Alps Estates, Inc.,* 136 *N.J.* 124, 128, 642 *A.*2d 384 (1994); *accord Newark Beth Israel Medical Ctr. v. Gruzen,* 124 *N.J.* 357, 362, 590 *A.*2d 1171 (1991). Before the statute was enacted, the development of several trends in the common law created the possibility that architects and contractors could be sued for injuries long after a project was completed, and the statute "meant to cut back on the potential of this group to be subject to liability for life." *Ibid.* (quoting *Ramirez v. Amsted Indus.,* 86 *N.J.* 332, 356, 431 *A.*2d 811 (1981)). We have read the statute broadly to accomplish this purpose. *Horosz, supra,* 136 *N.J.* at 129, 642 *A.*2d 384; *Newark Beth Israel, supra,* 124 *N.J.* at 363, 590 *A.*2d 1171.

The Appellate Division determined that the "performance or furnishing" of services and construction was not completed until

February 20, 1981, the date of "final completion," when the final items on the punch list were completed. *Russo Farms, supra,* 280 *N.J.Super.* at 330, 655 *A.2d* 447. The panel cited several justifications for its holding: this Court's opinion in *Horosz, supra,* the general principle that immunity from liability is not favored in the law, and the fact that the date of full completion is less nebulous and more readily provable than substantial completion. *Id.* at 330–31, 655 *A.2d* 447. We find none of those reasons compelling.

"Substantial completion has a definite meaning in the construction industry." *Perini Corp. v. Greate Bay Hotel Casino, Inc.,* 129 *N.J.* 479, 500, 610 *A.2d* 364 (1992), *overruled on other grounds by In re Tretina Printing, Inc. v. Fitzpatrick & Assoc., Inc.,* 135 *N.J.* 349, 640 *A.2d* 788 (1994). The American Institute of Architects (AIA) distributes widely-used forms that define and use the concept of "substantial completion." *See Perini, supra,* 129 *N.J.* at 500, 610 *A.2d* 364 (citing Justin Sweet, *Sweet on Construction Industry Contracts: Major AIA Documents* § 1.1 (1987)). Substantial completion is defined by the AIA (and the contract in this case, which was modeled on an AIA form) as the date when "construction is sufficiently complete . . . so the owner can occupy or utilize" the building. Substantial completion occurs when the architect certifies such to the owner and a certificate of occupancy is issued attesting to the building's fitness. *See id.* at 501, 610 *A.2d* 364. At that point, the building is inhabitable, and only touch-up items and disputed items, the "punch list," remain. The punch list is "a final list of small items requiring completion, or finishing, corrective or remedial work." *Viking Builders Inc. v. Felices,* 391 *So.2d* 302, 303 n. 1 (Fla.Dist.Ct.App.1980). In this case, substantial completion occurred on September 5, 1979, when the certificate of occupancy was issued and the architect certified to the owner that building was substantially completed.

As we discussed *supra* at 116, 675 *A.2d* at 1093, the statute's purpose is to provide a measure of repose and prevent "liability for life" against contractors and architects. However, as defendants point out, if liability were to be measured from the date the

last retainage is released and all disputed and punch list items are completed, a contractor's exposure to suit might be prolonged unreasonably. Disputes over workmanship and compensation for services can continue for years. Under the Appellate Division's analysis, a contractor would remain liable and the commencement of the statute of repose could be delayed indefinitely. Such a result is inconsistent with the statutory purpose to provide repose and allow contractors and architects to walk away from liability at a certain point in time; indeed, it would, all too often, provide "liability for life."

█ Other jurisdictions have interpreted their statutes of repose as beginning upon substantial completion. Approximately thirty other states have enacted statutes of repose; *Newark Beth Israel, supra,* 124 *N.J.* at 362, 590 *A.*2d 1171. Most of those states explicitly provide that the statute of repose commences at the date of substantial completion. *E.g., Ark.Code Ann,* § 16–56–112; *Cal. Civ.Proc.Code* § 337.1; *Conn. Gen.Stat.* § 52–584a; *Haw.Rev. Stat.* § 657–8; *Ind.Code,* § 34–4–20–2; *Ky. Rev.Stat. Ann.* § 413.135; *Minn.Stat. Ann.* § 541.051; *Mont.Code Ann.* § 27–2–208; *N.H.Rev.Stat. Ann.* § 508:4–b; *N.M. Stat. Ann.* 37–1–27; *S.D. Codified Laws Ann.* § 15–2A–3; *Tenn.Code Ann.* § 28–3–202; *Wis. Stat. Ann.* § 893.89; *Wyo. Stat.* § 1–3–111. Several other states, in addition to New Jersey, fail to designate when the statute of repose commences. *E.g., Ohio Rev.Code* Ann. § 2305.131 (declared unconstitutional in *Brennaman v. R.M.I. Co.,* 70 *Ohio St.*3d 460, 639 *N.E.*2d 425 (1994)); 42 *Pa. Cons.Stat. Ann.* § 5536; *Va.Code Ann.* § 8.01–250; *W. Va.Code* § 55–2–6a. Moreover, courts in some of those states have interpreted their statutes to begin running at substantial completion, when the property is fit for occupancy by the public. *See, e.g., Federal Reserve Bank v. Wright,* 392 *F.Supp.* 1126, 1130 (E.D.Va.1975); *Catanzaro v. Wasco Prod., Inc.,* 339 *Pa.Super.* 481, 489 *A.*2d 262, 266 n. 7 (1985). We agree with the rule applied in those other jurisdictions that the statute of repose commences with substantial completion.

Architects and contractors are free from all liability for their part in constructing a building on the lapse of ten years after the building is substantially completed, because such a holding is consonant with the statutory purpose. In this case, substantial completion occurred on September 5, 1979, when the certificate of occupancy was issued. Because suit was not filed until July 1990, more than ten years later, the claims against Kahley and Art Anderson are barred by the statute of repose.

## V

In summary then, with respect to the claims against the public entities, the dangerous condition claims against the City and Board may be pursued to the extent that injury was suffered within the relevant limitations period. Plaintiffs' nuisance claim against the City will similarly be allowed for each injury suffered within the limitations period. The trial court should, on a more complete record, determine whether the nuisance claim against the Board also involves a continuing nuisance. Finally, plaintiffs on the development of a more complete record may pursue their claims of inverse condemnation. The claims against Kahley and Art Anderson are time-barred under the six-year statute of limitations and the statute of repose.

The judgment of the Appellate Division is affirmed in part and reversed in part. The claims against Kahley and Art Anderson are dismissed, and the claims against the City and Board are hereby remanded to the trial court for further proceedings consistent with this opinion.

*For affirmance in part; reversal in part*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.